STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Phillip Wayne HARVEY, Defendant-Appellant.

Supreme Court

*No. 86–0024–CR. Argued May 29, 1987.—Decided June 19, 1987.*

(Also reported in 407 N.W.2d 235.)

354

For the plaintiff-respondent-petitioner the cause was argued by *Michael R. Klos,* assistant attorney, general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Louis B. Butler, Jr.,* assistant state public defender.

LOUIS J. CECI, J. This is a review of an unpublished decision of the court of appeals, dated October 8, 1986, which reversed a judgment of conviction and sentence entered by the Milwaukee county circuit court, Circuit Judge John E. McCormick, and which affirmed in part and reversed in part an order by the circuit court for Milwaukee county, Reserve Judge Leo B. Hanley, denying defendant Phillip Wayne Harvey's (Harvey) post-conviction motions.[1]

Harvey was sentenced on February 8, 1985, to a total of one hundred years. The sentence was imposed after the defendant had entered a guilty plea to the kidnapping and armed robbery charges and an *Alford* plea[2] as to the remaining first-degree sexual assault charges.

---

[1]The defendant was convicted of eleven counts: one count of kidnapping while armed (party to a crime (PTAC)), in violation of secs. 939.05, 939.63(1)(a)2, and 940.31(1)(b), Stats.; three counts of armed robbery (PTAC), in violation of secs. 939.05, 943.32(1)(a) and (b), and 943.32(2); and seven counts of first-degree sexual assault, three of those counts in violation of secs. 939.05 and 940.225(1)(b) (PTAC), and the four remaining counts in violation of sec. 940.225(1)(b).

[2]*See, North Carolina v. Alford,* 400 U.S. 25, 37 (1970).

On August 26, 1985, defendant moved to withdraw his plea on grounds that: the plea was not knowingly and voluntarily made; published statements made by the attorney who represented him through sentencing allegedly created an impermissible conflict of interest; and the alleged conflict, when considered in conjunction with counsel's failure to pursue suppression motions and his alleged failure to adequately explain the effect of an *Alford* plea to his client, constituted ineffective assistance of counsel.

The trial court denied defendant's motion in an order dated December 30, 1985, and filed January 2, 1986, for reasons stated in its oral decision (rendered on December 30). The defendant appealed from the order on January 2, 1986. The trial court's written findings of fact were filed on January 16, 1986, after the notice of appeal had already been filed, but within the sixty-day limitation period for the filing of findings and conclusions as set forth in sec. 805.17(2), Stats.

The court of appeals affirmed the trial court in most respects; it reversed only on a limited aspect of the effective assistance of counsel issue. It thus remanded the case to allow defendant to plead anew. The state petitioned this court for review of the appeals court decision, and we granted review on January 20, 1987.

The parties raise a number of issues on review. They are summarized as follows:

> "1. In determining that the defendant was denied effective assistance of counsel, did the appeals court err in ignoring fact findings made by the trial court and in substituting its own finding of fact to support its legal conclusion?

"2. Was defendant denied effective assistance of counsel because of counsel's failure to pursue two suppression motions?

"3. Did the alleged sentencing misrepresentations made by Harvey's attorney, which representations formed the basis of his ineffective assistance of counsel claim, render Harvey's pleas involuntarily and unknowingly made?

"4. Was defendant's plea rendered involuntary by the trial court's purported failure to expressly describe to the defendant the elements of the offenses with which he was charged?

"5. Was Harvey's right to counsel violated due to trial counsel's alleged conflict of interest?"

We hold that the appeals court improperly ignored findings made by the trial court when it decided that counsel's actions denied the defendant effective assistance of counsel. The trial court's fact findings are supported by credible evidence, and the appeals court impermissibly made independent fact findings of its own. Even if counsel did misrepresent certain facts to the defendant, the defendant was not induced by these representations to enter his pleas and, therefore, suffered no prejudice. We therefore reverse the court of appeals' determination that counsel's actions deprived defendant of effective assistance of counsel. We affirm the appeals court decision insofar as it held that counsel's failure to pursue the suppression motions did not deny Harvey effective assistance of counsel.

We also hold that Harvey's guilty and *Alford* pleas were knowingly and voluntarily made. The defendant was sufficiently aware of the significance of his actions and was adequately apprised of the elements of the crimes with which he was charged.

Finally, even if a conflict of interest did in fact exist, the defendant knowingly and voluntarily waived that conflict. We thus affirm the decision of the court of appeals with respect to each of these issues.

## I.

The events giving rise to this action occurred during the evening hours of July 14, 1984, and the early morning hours of July 15, 1984. On July 14, 1984, P.K., then eighteen years old, parked her car in downtown Milwaukee. As P.K. unlocked and exited her car, she observed two black males approach her vehicle. One of the men (Suspect A) pointed a long-barrelled handgun at her head and ordered her to get back into her car on the passenger side, which she did. The two men entered the car, both in the front seat. Suspect A then instructed the other individual (Suspect B) to "get the money" and remove P.K.'s jewelry. Two rings, a necklace, a wristwatch, and a minimal amount of cash were taken.

Then, Suspect A ordered Suspect B to blindfold P.K. He tore off a portion of her skirt and used it as a blindfold. By this time, P.K. had crawled to the back seat, and Suspect A was driving the car. P.K. was then forced to participate in a series of sex acts with Suspect B, with the handgun pointed at her side throughout the ordeal. In a statement made at sentencing, P.K. stated that Suspect A seemed to prompt the assault, giving Suspect B instructions on exactly what to do. The men subsequently traded places, and P.K. was once again subjected to repeated sexual assaults, this time with the gun pointed directly at her head. The car stopped. Suspect A left the car for a short time, during which time Suspect B again at-

tempted to have sexual intercourse with P.K. When Suspect A returned, he gave P.K. a skirt to put on. She was then led from the car and forced to climb into the trunk. P.K. was still blindfolded. The suspects closed the trunk and drove away. P.K. stated that the suspects stopped the car at least twice. Each time, they opened the trunk and "displayed" her to observers. P.K. could hear the voices of individuals who were apparently looking at her. At the first stop, Suspect B was heard to tell observers, "The white bitch is in the trunk." P.K. stated at sentencing that she heard people laughing and "congratulating" the suspects. Shortly afterward, the suspects drove the car to another location in the city, opened the trunk, and Suspect B gave the car keys to P.K., instructing her to stay crouched in the trunk for five minutes longer and to keep her ordeal to herself.

Other crimes were committed that night. Just after midnight on July 15, 1984, S.T. and L.H. were walking in downtown Milwaukee toward S.T.'s car. S.T. observed two black males, Suspect A and Suspect B, approaching her car. She quickly entered her car and locked the door on the driver's side. L.H. hurried to do the same, but could not lock her car door in time. Suspect B pulled the passenger door open and pointed a handgun at the two women. L.H. removed her jewelry and the money from her billfold and gave it to Suspect B. Suspect A then entered the car, sitting between the two women. S.T. gave him her purse; he in turn handed it to Suspect B, who was standing outside the passenger door. Suspect A then ordered S.T. to drive to Seventh and Galena Streets in Milwaukee. S.T. complied with Suspect A's orders. S.T. observed that she was being followed by a car

driven by Suspect B.[3] Suspect A then instructed S.T. to stop and get out of the car. She complied and watched Suspect A exit the car and run toward some adjoining housing projects. S.T. got back into her car and observed the car driven by Suspect B pull away. S.T. followed the car around the block and wrote down its license number, reporting it to the police.

A police investigation ensued, during which investigation a statement was obtained from a juvenile. The juvenile admitted his involvement in the crimes. On July 16, police came to Mollie Harvey's house in Milwaukee, looking for her son, Phillip. Mrs. Harvey allowed the officers to enter her home. According to police reports, three rings were found in Phillip Harvey's bedroom, all lying in plain view on top of a bureau. The police showed the rings to Mrs. Harvey, who did not recognize them. She stated that she did not give the officers permission to remove the rings from her home, she did not consent to a search of her living quarters, and she limited her consent to allowing the officers to enter her house to look for Phillip. Later that evening, the police returned to Mollie Harvey's home, this time with a search warrant. The police seized several pieces of evidence.

Shortly thereafter, Mrs. Harvey spoke with her son, Phillip, on the telephone. According to Mrs. Harvey, her son expressed to her a willingness to turn himself in to the police. Mrs. Harvey then accompanied her son to the police administration building downtown, where a statement was taken and where Harvey was taken into custody. According to the criminal complaint, Harvey admitted that he, accom-

---

[3]Defendant later admitted that these crimes were committed while P.K. was still in the trunk of her car; the car following S.T. and L.H., driven by Suspect B, was P.K.'s car.

panied by a juvenile referred to by him as "Fat Brains," did kidnap and rob P.K., place her in the trunk of her car and display her to individuals gathered near several "party spots" in the city of Milwaukee. He further admitted his involvement in the robberies of S.T. and L.H. He admitted that he was the individual sitting between the women in S.T.'s car and that "Fat Brains" followed in P.K.'s car. In addition, Harvey stated that the juvenile did sexually assault P.K. He admitted that he did force P.K. to perform oral sex on him; he denied that he committed any of the other assaults.

On July 17, 1984, a criminal complaint was issued against Phillip Wayne Harvey, initially charging him with five counts. Six additional counts were contained in an amended information, which was filed with the circuit court on September 4, 1984. In total, defendant was charged with one count of kidnapping while armed, PTAC, alleging that he "while using a dangerous weapon and by threat of imminent force, did seize P.K. without her consent and with intent to cause her to be held to service against her will, contrary to [Wis. Stats.] secs. 940.31(1)(b), 939.05, and 939.63(1)(a)2"; three counts of armed robbery, each alleging that the defendant did, by use of a dangerous weapon and by threat of imminent force, take property from the victim, with intent to compel the victim to acquiesce in the taking and carrying away of said property, contrary to secs. 943.32(1)(b), 943.32(2), and 939.05; and seven counts of first-degree sexual assault (three as PTAC). Two of the sexual assault counts alleged that the defendant did have sexual contact (penis to vagina) with the victim, P.K., without consent and by use of a dangerous weapon, in violation of secs. 940.225(1)(b) and/or 939.05. The remaining five counts

alleged that the defendant did have sexual intercourse (penis to anus (two counts), gun inserted in anus, penis to mouth, and gun inserted in vagina) with P.K., without her consent and by use of a dangerous weapon, in violation of either sec. 940.225(1)(b) alone or both secs. 940.225(1)(b) and 939.05.

The following day, July 18, 1984, defendant made his initial appearance in the circuit court for Milwaukee county, before Circuit Judge Arlene D. Connors. Representing the defendant was Attorney Alan D. Eisenberg. The reading of the criminal complaint was waived, and Eisenberg argued for a reduction of bail.

After the initial appearance, Mrs. Harvey spoke with Eisenberg directly for the first time, reaffirming her desire to retain his services for representation of her son. She had apparently contacted someone in Eisenberg's office earlier to arrange for Eisenberg to represent her son at the initial appearance. Mrs. Harvey did this on her own initiative; it is undisputed that Phillip Harvey did not ask his mother to retain the services of an attorney for him. Later that day, Mrs. Harvey entered into a written retainer agreement, signed by her and a representative of Eisenberg's law firm. The contract specified an initial retainer fee of $1,000. The contract also provided that Eisenberg's minimum charge was $150 per hour.[4] At the top of the contract, the following words are written: "Fee doesn't include trial."

Mrs. Harvey later testified that she retained Eisenberg "to represent Phillip, to look out for his rights and to see if he could get less time as he could." Statements by defendant's sister, Brenda Bufford, and

---

[4]Mrs. Harvey maintains that this contract provision was never pointed out to her.

his girlfriend, Freda McDaniels, also indicate that the purpose of the representation was to ensure that defendant would be sentenced to as little prison time as possible. This was Eisenberg's perception of his duties in representing the defendant.

The defendant was next in court on July 25, 1984. The most significant aspect of court proceedings on that date dealt with an alleged conflict of interest that arose due to a statement made by Eisenberg before he had been hired to represent the defendant. On July 17, 1984, an article appeared in *USA Today,* a newspaper with nationwide distribution, regarding the robberies and assaults. The article indicated that a fourteen-year-old male had been arrested in connection with the crimes and that "a second suspect is [still being] sought." The writer of the article elicited comments from several Milwaukee residents about the crimes. Attorney Eisenberg was one of the interviewees. The portion of the article which created the arguable conflict of interest reads as follows: "'I hope they fry in hell,' says activist lawyer Alan Eisenberg, who has defended rape suspects." The state responded to this article by moving to *voir dire* counsel and the defendant on the potential conflict of interest created by the statement.

Eisenberg attempted to explain the context in which he made that statement during the court proceedings on July 25. Eisenberg stated that a *USA Today* reporter called him, before Harvey had been apprehended and before Mrs. Harvey contacted his office regarding the representation of her son, and asked him the following question: "If they catch the guys who did it and proved that they did it, what should be done with them?" Eisenberg stated that his full response was, "If they catch the guys who did it

and prove that they did it, I hope they fry in hell." Eisenberg stated that he did not believe that the statement created a conflict, especially when considering the fact that the statement was made before Mollie Harvey hired him.

After Eisenberg made his statement, the circuit court, Judge Frank T. Crivello, informed the defendant of his sixth amendment right to counsel and proceeded to ask the defendant the following questions:

"Q   [By the court] First of all, at the time that you accepted Mr. Eisenberg as your lawyer, did you know that Mr. Eisenberg had made the statement that's been alluded to in the newspaper?

"A   [Defendant] Yes.

. . .

"Q   One of the things that the District Attorney has suggested is that you should be given the right to consult with an independent lawyer on the issue of whether or not you should retain Mr. Eisenberg as your lawyer. Do you want to talk to an independent lawyer about that?

"A   Not really, sir.

"Q   Knowing what Mr. Eisenberg has said and the opinion that he has expressed and has been published, do you still want Mr. Eisenberg to be your lawyer?

"A   I feel comfortable with him representing me. We had talked about it, and he said he would give me the best chance he can.

. . .

364

"Q  As you sit there right now, Mr. Harvey, do you believe that this attorney, in spite of what was said in the newspaper, will do the best possible job he can in representing you in this case?

"A  Yes.

"Q  And as you sit there right now, Mr. Harvey, are you one hundred percent willing to have Mr. Eisenberg as your lawyer no matter what happens?

"A  Yes.

"Q  Has anybody threatened you in any way to get you to say this to me today?

"A  No, sir.

"Q  Has anybody promised you anything to get you to say this to me today?

"A  No.

"Q  Have you considered this very carefully?

"A  I talked it over with my family.

"Q  Do you waive any appearance of conflict of interest based on Mr. Eisenberg's statement in the paper that the people who did this should fry in hell?

"A  I feel there is no conflict of interest.

"Q  Do you want to proceed throughout this case in spite of what was said in the newspaper with Mr. Eisenberg as your lawyer?

"A  Yes, sir.

"Q  Don't forget what I told you. If something happens in this case that's unfavorable to you or something that you are dissatisfied with, I'm not going to listen to you later on

complain that you should have gotten another lawyer. If you are not one hundred percent sure that this man is going to do his best in defending you, then tell me now because this is your last chance. This case is not going to be retried based on this once you've made this decision today. Do you understand me?

"A    Yes.

"Q    What do you want to do?

"A    I want to keep—continue to have Alan Eisenberg as my attorney.

"THE COURT: All right. I'm satisfied that the defendant has made a knowing and voluntary waiver of any appearance of impropriety."

Eisenberg thus continued in his representation of the defendant.

On August 10, 1984, defendant again appeared in court with Eisenberg, this time to waive his right to a preliminary hearing. Judge Crivello again questioned the defendant to ensure that he understood his rights and understood the significance of the waiver. Counsel at that time informed the court that a jury trial would be sought, but with a change of venue.

The defendant was subsequently arraigned on September 4, 1984, in the Milwaukee county circuit court, before Judge John E. McCormick. The defendant, through counsel, acknowledged receipt of the amended information (which enumerated all eleven counts) and waived the reading of the information. A plea of not guilty was entered, and counsel formally requested a change of venue for purposes of trial. Further proceedings were subsequently held, in which the parties and the court agreed to jury selection procedures and the place of venue. A trial date of

December 11, 1984, was set, and the attorneys were scheduled to begin jury selection in La Crosse on the preceding day.

Eisenberg testified that the preparations for trial were merely strategic and that the defendant had never intended to proceed to trial. He testified that he went ahead with venue and jury selection arrangements simply to present the state with the possibility of an expensive and lengthy trial, hoping all along that the state might respond by dropping some of the counts or recommending a shorter sentence. Thus, he viewed the trial preparation maneuvers as a "bargaining chip" to be used against the state.

On December 7, 1984, the defendant appeared in Judge McCormick's courtroom, with his attorney at his side. Eisenberg indicated to the court that Harvey wished to waive his right to a jury trial. The court then asked the defendant the following questions:

> "THE COURT: Mr. Harvey, you understand that you do have a constitutional right to a trial by jury, do you not?
>
> "DEFENDANT HARVEY: Yes, I do.
>
> "THE COURT: And do you know what a jury trial consists of, sir? It consists of 12 people who would be selected, 12 citizens, who would sit over there in that jury box to your right, you see that? And they would hear the testimony, and under your plea of not guilty to every specific charge, they would have to come to a unanimous conclusion whether you are guilty or not guilty as to each charge in the information, you understand that?
>
> "DEFENDANT HARVEY: Yes.
>
> "THE COURT: Now is it your wish, and your request, of this court that you waive or give up your right to a trial by jury?
>
> "DEFENDANT HARVEY: Yes.

"THE COURT: You understand that once that waiver is given, that you can't then switch back and say over the weekend, when we come back, I now want to have a jury trial, you understand that?

"DEFENDANT HARVEY: Yes.

"THE COURT: So that when you waive it, are you satisfied that that is a complete waiver, never will it be revived, so to speak?

"DEFENDANT HARVEY: Yes.

"THE COURT: All right, and then you are— you wish to have this matter tried before the court, is that correct?

"DEFENDANT HARVEY: Yes."

Four days later, on December 11, 1984, the defendant changed his plea. Harvey pled guilty to the armed robbery and kidnapping charges and entered an *Alford* plea on the remaining first-degree sexual assault charges. At that time, Eisenberg submitted to the court a guilty-plea questionnaire which pertained to the robbery and kidnapping charges and an *Alford*-plea questionnaire applicable to the seven sexual assault charges. Each questionnaire was signed by the defendant, and Eisenberg represented to the court that his client had read each document, that he had explained to the defendant that the court would make a finding of guilt as to each *Alford* plea entered, and that the defendant was aware that his maximum possible prison sentence was a total of 230 years.

Judge McCormick then addressed the defendant directly, asking him, with respect to each count, how he wished to plead. The judge asked the defendant whether Eisenberg had advised him of his constitutional rights, whether he understood the nature of the plea proceeding, and whether he knew which constitu-

tional rights he was giving up by entering the guilty and *Alford* plea (each right was specifically enumerated). The defendant answered each of these questions in the affirmative. He was asked whether he was induced by any threats or promises to enter his pleas. Defendant responded in the negative. Judge McCormick then went over each of the eleven counts and asked Harvey whether he was aware of the maximum possible prison sentence for each.[5] Harvey and his attorney had a copy of the information and followed along as the judge read each count and its corresponding possible prison term. Harvey responded that he was aware of the possible penalty for each count and knew that he could be sentenced to a minimum of 20 or 30 years or the maximum of 230 years. Judge McCormick then ruled that the pleas were knowing and voluntary; he convicted the defendant on each of the counts and set sentencing for early February, 1985.

On February 8, 1985, defendant was sentenced to a total of one hundred years, ten years on Count 1 (the kidnapping charge), and nine years on each of the remaining ten counts, each sentence to be served consecutively. The court's sentence coincided with the sentencing recommendation made by the state. Before Harvey was sentenced, the court elicited statements from two of the victims, from Mollie Harvey, and from the defendant himself. The defendant expressed remorse for the crimes committed and indicated that he wanted to apologize to the sexual assault victim. Eisenberg did not pursue an appeal on defendant's

[5]Judge McCormick specifically indicated to the defendant how long his prison term could be for each count.

behalf, and his representation of the defendant did not extend beyond sentencing.

Thereafter, assistant state public defender Louis Butler, Jr. undertook representation of the defendant, filing the motion for withdrawal of defendant's plea, which has ultimately become the focus of our review. As part of the motion, Butler argued that Harvey's plea should be withdrawn because it was not knowingly and voluntarily made and because of the purported conflict created by Eisenberg's "I hope they fry in hell" statement.

On October 3, 1985, a hearing on defendant's plea motion was held in Milwaukee county circuit court, before Judge McCormick. At an *in camera* proceeding conducted just before formal in-court testimony was accepted, Judge McCormick heard the statement of Harvey's former counsel, Alan Eisenberg. Eisenberg described the events which occurred on December 11, 1984, the date that Harvey entered his *Alford* and guilty pleas. Eisenberg recalled his attempts to pursue a reduction in the state's recommended sentence of 100 years. He recollected that he informally conferred with prosecutor Dan Blinka and the court on that date to discuss sentencing possibilities. Eisenberg recalled telling the court at that conference that 100 years was a stiff sentence, one he felt his client would find "a little tough to live with." Eisenberg then claimed that Judge McCormick wrote the number "75" on a piece of paper lying on his desk, gave it to Eisenberg, and said something indicating that "that was what he was thinking about" in terms of the imposition of a sentence. Eisenberg stated that he then took the paper to his client and announced that fact. Eisenberg claims that he merely told Harvey that the judge was thinking about 75 years; he denied ever telling Harvey

that the judge promised a 75-year sentence. He also stated that he informed the defendant that the judge was free to impose the maximum sentence of 230 years and that the state was "firm" on its 100-year sentence recommendation.

Judge McCormick recalled that Eisenberg suggested a 75-year sentence at the conference which was held on December 11, because it would be easier to "sell" to his client than a 100-year sentence.[6] Judge McCormick remembers instructing Eisenberg and Blinka to approach the district attorney with the 75-year figure. Eisenberg did meet with the D.A., who reiterated that the state's recommended sentence was firm. Judge McCormick stated that he never wrote the number "75" on a piece of paper; nor did he see either Blinka or Eisenberg do so.

While Judge McCormick conducted the motion hearing on October 3, 1985, he later recused himself from further participation in the matter. Testimony and closing arguments continued on November 25, 26, and 27, 1985, Reserve Judge Leo B. Hanley presiding.

## II.

The trial court denied defendant's motion in an order dated December 30, 1985. The court's order denying defendant's post-conviction motion was en-

---

[6]Though Blinka did not testify in person, he was contacted to provide the court with his recollection of the events in question. An offer of proof made on the second day of the motion proceedings indicated that if Blinka was called to court, he would have testified that: (1) he never saw Judge McCormick write anything on a piece of paper and hand it to Eisenberg; (2) he did not see Eisenberg write the number "75" on a piece of paper; and (3) the state's recommended 100-year sentence remained firm whether Harvey pled guilty or whether he proceeded to trial.

tered on January 2, 1986, and specific findings of fact incorporating the court's oral decision were filed on January 16, 1986.

In its written memorandum decision, the trial court held that defendant's pleas were knowingly and voluntarily made. It believed that Judge McCormick meticulously explained Harvey's constitutional rights to him and specifically ascertained that Harvey was aware of the possible total sentence. The judge additionally went through each of the eleven counts with the defendant, pointing out the maximum sentence possible for each. In his decision, Judge Hanley stated that the elements of the crimes charged were listed in each of the counts as they were read by Judge McCormick. The elements of the crimes were also enumerated in the criminal complaint. (The criminal complaint was stipulated to by Harvey as providing the factual basis for his pleas.) Thus, Harvey was informed of the elements of the crimes with which he was charged. Judge McCormick also explained to the defendant the significance of the *Alford* plea.

Second, Judge Hanley decided that Harvey's ineffective assistance of counsel claim was without merit. Eisenberg was never hired to conduct a trial; he was hired with the understanding that his role was to protect Harvey's rights at sentencing. Eisenberg lived up to that role. He attempted to negotiate a plea of 75 years; it is undisputed that Eisenberg questioned the district attorney about a 75-year sentence. Counsel's failure to pursue both suppression motions was not improper, the court held, because there was no merit to those motions. Mrs. Harvey let the police officers into her home, and they discovered three women's rings in plain view.

With regard to the ineffective assistance of counsel claim, the court stated further that Harvey indicated that he was satisfied with Eisenberg's performance as his attorney.[7] Eisenberg told his client what an *Alford* plea was and informed him of the consequences of entering such a plea.

The last argument addressed was whether a conflict of interest existed. Judge Hanley decided that any such conflict was knowingly waived by the defendant, as shown by his responses to Judge Crivello's questions at the hearing conducted on July 25, 1984. *See,* pp. 9–11, *supra.*

Finally, Judge Hanley made the following finding of fact:

> "The question has also arisen as to whether Judge McCormick wrote the figure 75 down on a piece of paper. While the testimony in this matter is conflicting, and while it is not material to the principle [sic] issues involved at the present time, this court does address the question and finds based on the testimony adduced at the motion hearings that Judge McCormick did not execute a paper with the figure 75, and Judge McCormick did not enter into any plea bargaining agreement."

Judge Hanley, in his oral decision which was explicitly incorporated by reference into his written memorandum decision, also stated the following: "The only reasonable inference that can be drawn is that *there*

---

[7]In fact, curiously, Harvey testified at the motion hearing that he did not feel dissatisfied with Eisenberg's performance *until the second day of the motion proceedings* (November 25, 1985), when he heard Judge McCormick testify that he never wrote the number "75" on a piece of paper.

*never existed* a piece of paper with the figure 75."
(Emphasis added.)

The court of appeals, in a decision dated October 8, 1986, affirmed the trial court in all respects, except that it reversed the trial court's determination that Harvey was afforded effective assistance of counsel.[8] It therefore remanded the cause to allow Harvey to plead anew. In so holding, the appeals court stated that the trial court's finding that Judge McCormick did not write the number "75" on a piece of paper was not clearly erroneous. However, the court, after considering the testimony of Mollie and Phillip Harvey (both claiming that Eisenberg showed them a piece of paper with the number "75" written on it), combined with Judge Hanley's fact findings, then stated that "the only reasonable inference that can be drawn is that Attorney Eisenberg wrote the figure "75" on a piece of paper." It therefore held that "Eisenberg's act was deficient performance, as an ordinarily prudent lawyer skilled in criminal law would not misrepresent the facts to his client in order to induce him to plead guilty or no contest as charged." The court further determined that Eisenberg's misrepresentation was prejudicial to the defendant, because Harvey stated that he would have gone to trial had Eisenberg not represented to him that the judge was thinking of a 75-year sentence.

## III.

We first address the issue of whether Harvey was denied effective assistance of counsel. We must deter-

---

[8]It did so only with respect to a narrow aspect of the assistance of counsel claim, i.e., whether Alan Eisenberg had represented to his client that Judge McCormick would impose a 75-year sentence and whether that representation rendered Harvey's plea involuntary.

374

mine "whether counsel's assistance was reasonable, considering all the circumstances." *Strickland v. Washington,* 466 U.S. 668, 688 (1984). To avoid the "distorting effects of hindsight," the court is bound to evaluate the allegedly improper conduct from counsel's perspective, as of the time of counsel's conduct, and the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

*Strickland* adopted a two-pronged test, as follows:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

With respect to the second prong of the *Strickland* analysis, the defendant is obligated to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

375

The standard of review we utilize is as stated in *State v. Johnson,* 133 Wis. 2d 207, 395 N.W.2d 176 (1986). "Whether counsel's actions constitute ineffective assistance is a mixed question of law and fact. ... The trial court's determinations of what the attorney did, or did not do, and the basis for the challenged conduct are factual and will be upheld unless they are clearly erroneous." *Id.* at 216 (citations omitted). However, the ultimate conclusion of whether the attorney's conduct resulted in a violation of defendant's right to effective assistance of counsel is a question of law; thus, no deference to the trial court's decision is required. *Id.*

The appeals court conceded that Judge Hanley's findings were not clearly erroneous. In so doing, it did not address a finding made by Judge Hanley in his oral decision, namely, that the piece of paper never existed. We do not know whether the appeals court considered this finding of fact. However, it is evident that the apeals court made its own independent fact determination. The appeals court erred in making its own finding because in so doing, it impermissibly took on the role of trier of fact, a role reserved to Judge Hanley. *Barrera v. State,* 99 Wis. 2d 269, 282, 298 N.W.2d 820 (1980), *cert. denied* 451 U.S. 972 (1981).

Judge Hanley indicated that his conclusions of law contained in the written decision were supported by "the transcribed oral decision ... which [is] specifically incorporate[d] by reference herein." That statement unambiguously indicates that the statement "there never existed a piece of paper with the figure '75'" was specifically intended to be a finding of fact. As such, that finding should not have been rejected by the reviewing court unless it was clearly erroneous.

We believe that the trial court finding that a piece of paper never existed is not clearly erroneous.

Judge McCormick emphatically denied ever executing the document in question. The prosecutor backs up Judge McCormick's version of the facts. Neither recalls ever having seen such a piece of paper, whether it was executed by Judge McCormick or by someone else. This testimony, coupled with the fact that the paper cannot be produced, is consistent with Judge Hanley's finding that the paper never existed.

Eisenberg and the Harveys maintain that the piece of paper did exist. Even here, however, the parties are in sharp dispute as to the facts. Eisenberg maintains that he told the defendant that the "75" was not a promise but rather an indication of the sentence the judge was thinking of imposing and, further, that the court was not bound by the purported promise and in fact could impose the full 230-year sentence. Phillip and Mollie Harvey testified that Eisenberg characterized the "75 years" as a promise of the sentence that would be imposed, a promise that supposedly induced the plea.

The trial court heard the exhaustive testimony of nearly a dozen witnesses and was in the best position to judge credibility. Credibility determinations are central to disposition of this case. The trial court found Judge McCormick's testimony to be most persuasive and found Eisenberg and the Harveys to be unpersuasive. It emphasized the failure by both the defendant and his mother to mention the judge's purported 75-year "promise" when both had the opportunity, and indeed took the opportunity, to address the court at the time of sentencing. Judge Hanley evidently believed that their silence at sentencing was inconsistent with their versions of the facts

as presented at the motion hearings. These credibility determinations are best reserved to the trial court, and its findings of fact are not clearly erroneous.

Further, even assuming that the trial court had made a finding that Eisenberg told the defendant that Judge McCormick would impose a 75-year sentence, that finding would not have compelled a determination that Harvey was denied effective assistance of counsel. The second prong of *Strickland's* two-pronged test for ineffective assistance of counsel asks whether counsel's conduct was prejudicial to the defendant, that. is, whether it undermined the integrity of the proceedings. A finding of prejudice would exist if, but for Eisenberg's misrepresentation, Harvey would not have pled as he did and would have instead proceeded to trial. *Strickland,* 466 U.S. at 694.

At the motion hearings held after sentence was imposed, both Mollie and Phillip Harvey testified that they expected a trial would be held.[9] Other testimony reveals some inconsistencies on this point. Mrs. Harvey testified that she hired Eisenberg "to look out for [Phillip's] rights and to see if he could get less time as he could." She testified further that she was aware that the contract stated that "fee doesn't include trial" *and that a guilty plea would probably be the mechanism* by which Harvey's potential sentence could be lessened. Phillip Harvey recalled talking to Eisenberg about having a trial on more than one occasion; he does not, however, remember the substance of those conversations. He also echoed that he

[9]Mrs. Harvey paid an additional $2,000 to Attorney Eisenberg as compensation for his services sometime after the original $1,000 retainer had been paid. She testified that it was her understanding that this additional compensation was for trial preparation.

wanted Eisenberg to "represent me, protect my rights, give me the less time as possible."

The Harveys' testimony is replete with statements to the effect that their goal was to reduce Phillip's sentence. In this respect, their testimony is consistent with Eisenberg's statement. Eisenberg stated that Harvey unequivocally stated that he did not want a trial and did not want to put the victim on the stand. The defendant himself indicated to the court that he did not wish to traumatize the victim by forcing her to testify. The defendant knew that the state had substantial evidence against him, having admitted to reading the police reports, knowing that the juvenile would be willing to testify against him, and being aware of the serological reports and other crime lab reports. Finally, it is significant that Judge McCormick thoroughly questioned Harvey to ensure the voluntariness of the jury trial waiver and entry of the guilty and *Alford* pleas. *See,* pp. 367–368, *supra.* Based on these facts, the trial court made a finding of fact that Eisenberg was hired to represent Harvey at sentencing and not to pursue the matter to trial. This finding is not clearly erroneous. Therefore, even if Eisenberg made certain mispresentations, that conduct did not induce Harvey to plead as he did. Credible evidence exists to show that it was never Harvey's intent to proceed to trial. Harvey was not prejudiced by counsel's actions and, therefore, his ineffective assistance of counsel argument must fail. We reverse the court of appeals' determination that Harvey was denied effective assistance of counsel; thus, Harvey should not be allowed to withdraw his plea and plead anew.

379

■ Eisenberg's failure to pursue the two suppression motions was similarly not improper. Harvey now argues that Eisenberg should not have withdrawn two suppression motions originally submitted to the trial court. One motion sought suppression of the women's rings taken from Mollie Harvey's home and the other sought suppression of defendant's confession. Eisenberg stated that he withdrew the motions because, in his professional judgment, he believed they were without merit. Mrs. Harvey admitted that she freely consented to the police officers' entry into her home, although she testified that she told the officers as they were leaving her home that they did not have permission to remove any items from her home. However, it is undisputed that the items were found in plain view. The trial court's finding that a reasonably prudent attorney, under these circumstances, would not have further pursued this motion is not clearly erroneous. Viewing the circumstances from Eisenberg's point of view, as *Strickland* mandates, it is evident that counsel reasonably concluded that pursuing the suppression motion would be fruitless. Eisenberg testified that continued pursuit of the second motion, to suppress Harvey's confession, would also be without merit, based on statements made to him by Harvey and on Harvey's representation that the police report's description of his confession was correct. Eisenberg's failure to preserve this motion for appeal purposes was not outside the range of acceptable professional judgment.

The next issue is whether defendant's pleas were knowingly and voluntarily made. That determination must be made on the basis of the decisions of this court rendered prior to *State v. Cecchini,* 124 Wis. 2d 200,

368 N.W.2d 830 (1985). In *State v. Bangert,* 131 Wis. 2d 246, 389 N.W.2d 12 (1986), we overruled *Cecchini's* requirement that the trial court demonstrate on the record at the plea hearing the defendant's understanding of the elements of the crime charged and their relation to the facts. But because *Bangert* was to be applied prospectively only, our decision must rest on pre-*Cecchini* law. 131 Wis. 2d at 281.

Under pre-*Cecchini* law, a defendant seeking to withdraw a guilty or no contest plea was required to establish the existence of a manifest injustice. *State v. Rock,* 92 Wis. 2d 554, 285 N.W.2d 739 (1979). Clear and convincing evidence of the denial of a relevant constitutional right was considered to compel withdrawal of the plea as a matter of right. 92 Wis. 2d at 559. To withdraw a plea as a matter of right on constitutional grounds, the defendant was required to show:

> (1) that a violation of a constitutional right ha[d] occurred; (2) that this violation caused him to enter a plea of guilty or of no contest; and (3) that at the time of his plea, he was unaware of the potential constitutional challenges to the case against him because of the violation. *Id.* (citation omitted).

Furthermore, the trial judge was bound to specifically ascertain, at the plea hearing itself, whether the defendant had an adequate understanding of the crimes charged. *Hatcher v. State,* 83 Wis. 2d 559, 266 N.W.2d 320 (1978). Even though the court was bound to determine *at that time* whether the defendant understood the nature of the charges, it was not precluded from examining the entire record to aid in that determination. *See, White v. State,* 85 Wis. 2d 485, 271 N.W.2d 97 (1978).

The voluntariness of a plea presents a question of constitutional fact. Historical facts, as found by the trial court, will not be reversed unless they are clearly erroneous. However, the application of constitutional principles to those facts is a matter for this court's independent determination. *State v. Turner,* 136 Wis. 2d 333, 343–44, 361, 401 N.W.2d 827 (1987).

■

As a preliminary matter, our finding that Harvey did receive effective assistance of counsel requires us to reject defendant's argument that Eisenberg's alleged misrepresentation (forming the basis of the ineffective assistance of counsel claim) rendered his plea involuntary. Nor can a finding of involuntariness be based on a claim that neither the court nor Eisenberg adequately explained the elements of the crimes with which he was charged or the effect of entering an *Alford* plea. Harvey has failed to establish, by clear and convincing evidence, the existence of a constitutional violation; thus, those claims are without support. First, Harvey admitted that he received and read the police reports and went over their contents with counsel. He also admitted that Eisenberg explained the effect of an *Alford* plea to him. Harvey testified that counsel advised him that the effect of an *Alford* plea was as follows: "He told me this ain't saying I did it and this ain't saying I didn't do it, but *knowing there's enough evidence to convict me.*" (Emphasis added.) While Harvey initially testified that Eisenberg failed to explain the elements of the crimes to him, he later reversed himself, in response to these questions from the prosecutor:

> "Q    Are you telling Judge Hanley that you really
>      didn't know what it was you were pleading

guilty to and pleading no contest under the *Alford* to?

"A    Yes.

"Q    You did or didn't know?

"A    I knew."

Harvey admitted that the court also adequately explained to him the elements of the crime and the effect of an *Alford* plea. He recalled the lengthy interchange he had with the court at the plea hearing, *see,* pp. 367–368, *supra,* and explicitly testified that he understood the nature of the charges to which he was pleading, the corresponding maximum sentence for each charge, and that the district attorney remained firm on a recommended 100-year sentence. He finally admitted that he knew the judge would treat the *Alford* plea in the same manner as he would a plea of guilt.

These facts—gleaned from the transcript of the plea proceeding and other testimony contained in the record—compel a finding of voluntariness. Also, supporting such a finding is the fact that defendant signed a guilty-plea and an *Alford*-plea questionnaire, both of which indicated that he was not induced by any threats or promises to plead guilty and was satisfied with the representation he received. The court ascertained on the record that he did in fact agree with those statements. The facts thus adequately support a conclusion that, as a matter of law, the pleas were knowingly and voluntarily made.

The final consideration is whether Eisenberg's purported conflict of interest so infected the integrity of the court proceedings as to result in unfairness to the defendant. Harvey's testimony on this issue is wrought with inconsistencies, although he ultimately

admitted that he knew of the *USA Today* quote before his mother formally retained Eisenberg's services. He admitted, in addition, that he discussed the article with counsel and thereafter independently concluded that he was confident that Eisenberg could adequately represent his interests. Judge Crivello questioned Harvey to determine whether he was aware of counsel's statement and whether he wished to retain Eisenberg's services. At the motion hearing, Harvey stated that he responded truthfully to Judge Crivello's questions regarding his desire to waive the conflict. Judge Crivello was satisfied that the defendant knowingly, voluntarily, and intelligently waived any purported conflict created by counsel's statement; this conclusion was not unreasonable.

We are similarly unpersuaded by the argument that Mollie Harvey's retention of Eisenberg created an impermissible conflict of interest. She, along with other family members and friends, paid counsel's fees, and she initially hired Eisenberg. It is undisputed that Phillip did not ask his mother to hire an attorney for him; however, it is equally true that the defendant testified that he was satisfied that his mother had done so. Both mother and son testified that they wanted Eisenberg to help Phillip obtain the minimum sentence possible. It is simply incongruous to suggest that the Harveys had differing interests, sufficient to create an inference of a conflict of interest.

The decision of the court of appeals is reversed insofar as it held that Harvey received ineffective assistance of counsel, in violation of his sixth amendment right to counsel, and insofar as it ordered the trial court to permit defendant to plead anew. The

decision of the court of appeals, in all other respects, is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.