**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 3, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2071-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF4706

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KEITH ALLEN LAMONT SIMS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: FREDERICK C. ROSA and DAVID A. FEISS, Judges. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.    Keith Allen Lamont Sims appeals from a judgment convicting him of multiple crimes related to an armed robbery.    Sims also appeals from the order denying his postconviction motion for relief.    Upon review, we affirm.

## BACKGROUND

¶2    On October 20, 2016, the State charged Sims with armed robbery, first-degree reckless injury while using a dangerous weapon, armed burglary, aggravated battery while using a dangerous weapon, and possession of a firearm by a felon.    According to the complaint, Sims and a male co-actor entered D.R.'s home, the armed suspect pointed a gun at D.R. and demanded money.    Both Sims and the co-actor were masked.    When D.R. stated that he did not have any money, one of the men struck him in the face with a gun and turned his attention to D.R.'s girlfriend, S.H.    The armed man asked for her purse and struck her in the head causing her to fall to the floor.    After the men searched the kitchen, the armed man grabbed S.H. by the arm and took her to a bedroom, where he shot her in the leg. When the armed man came out of the room, he pointed a gun at D.R. "and pulled the trigger twice[,] but the gun did not fire."    Both men ransacked the residence and took down two televisions, but left one behind.    Sims's fingerprints were later recovered from the television.    The complaint further states that both D.R. and S.H. identified Sims from a photo array.

¶3    Prior to trial, Sims, though represented by counsel, filed a *pro se* motion to suppress identification evidence, alleging that he was identified as a result of an impermissibly suggestive photo array.    At a hearing, counsel told the trial court that the identification issue should be addressed during witness cross-examination, not at a suppression hearing.    Sims conferred with counsel and the

trial court conducted a colloquy with Sims to ascertain whether Sims agreed with counsel's strategy. Sims told the court that he agreed with counsel. Also prior to trial, Sims's counsel provided a notice of alibi, alleging that Sims was with Cedric Buck when the crimes occurred.

¶4 The matter ultimately proceeded to trial where multiple witnesses, including law enforcement, D.R., S.H., and Sims, testified. Detective Gary Cole testified about the photo array he presented to D.R. and S.H. Cole stated that Sims's photo was included in the array because his fingerprints were found on the television. The array consisted of eight folders, including six folders each containing a photograph and two folders with a blank piece of paper. Cole stated that he ensured that no one photo stood out by eliminating "discrepancies like neck tattoos or anything like that that would single out my suspect over the other[s]." He also stated that standard procedures provide that the officer showing the array should not know the target, but he knew Sims was a target. Cole clarified that he was not prohibited from administering the array, however, because he did not know which folder contained Sims's photo. Cole further testified that his practice is to use a standardized department form to instruct the witnesses on how the array is conducted, ensure the witnesses' understanding of the instructions, and tell the witnesses that they are not required to make an identification. Cole also stated that he does not tell the witnesses that the suspect is in the photo array.

¶5 Here, Cole took the array to the hospital where S.H. was being treated. He stated that S.H. went through the folders one by one, and when she reached the third folder—the one with Sims's photo—she set it aside before continuing with the other folders. After viewing all of the folders, S.H. handed Cole the third folder and positively identified Sims as her shooter. When Cole

3

asked S.H. why she chose that folder, she stated that she recognized the perpetrator's eyes and the shapes of his nose, mouth, and head. Cole also had S.H. sign the back of the third photo where she wrote "positive ID of shooter." After S.H. signed the photo, Cole asked her if she knew Sims and told her that "she picked the person who left fingerprints behind on the TV." Cole acknowledged that his statements were against department policy.

¶6    Cole testified that he later took the same photo array to D.R. and did not shuffle the photos. Cole also testified that he was unaware of the department policy that requires the creation of a new array when the same suspect will be shown to another witness. Cole stated that D.R. was struggling to open his left eye due to the injuries he sustained during the robbery and that D.R.'s glasses had been broken during the robbery, but said that D.R. also positively identified Sims. Specifically, Cole said that when D.R. reached the third folder, he stood up and slammed his finger against the photo, stating "[t]hat's the motherfucker who did it." D.R. asked Cole whether the perpetrator's name was Keith, to which Cole responded, "[j]ust keep going." Cole stated that after D.R. finished reviewing the photos, Cole noticed that D.R. circled "No. 3" on the identification form, rather than "yes" or "no." Cole told D.R. that he needed to circle "yes" or "no" for the third folder. When D.R. circled "no," Cole asked D.R. whether or not he made an identification. D.R. responded in the affirmative. Cole told D.R. that he had to circle "yes," at which point D.R. circled "yes" "a whole bunch of times." D.R. placed his initials next to the alteration on the form. Cole admitted that the array contained the photo also initialed by S.H., but stated that D.R. did not see the initials as they were on the back of the photo and not visible.

¶7    After D.R. marked the form, Cole asked D.R. how he knew Sims. D.R. told Cole that Sims was the son of a friend, but that he had not seen Sims in

4

years. Cole admitted to telling D.R. that Sims was a suspect after D.R. finished viewing the photo array.

¶8 Both D.R. and S.H. testified consistent with the facts in the criminal complaint. With regard to their identification of Sims, D.R. testified that he identified Sims from the photo array, that he told Cole he recognized "Keith" when he reached Sims's picture, and that Cole told him about Sims's fingerprints being found on the television after D.R. made an identification. S.H. testified that Cole did not tell her whose fingerprints were in the house until after she identified Sims and signed and dated the form. She also stated that Cole did not indicate who S.H. should identify.

¶9 Sims also testified, telling the jury that D.R. was a family friend with whom Sims would drink and smoke. Sims denied robbing D.R. and shooting S.H., stating that he was with his five-year-old son on the night of the incident. Sims testified that D.R. was angry with him for selling D.R. fake drugs and then refusing to refund D.R.'s money. Sims also stated that his fingerprints were on D.R.'s television because he turned the television on while visiting D.R. in the past.

¶10 The jury ultimately found Sims guilty as charged. The trial court imposed a combination of concurrent and consecutive imprisonment terms, resulting in a total term of imprisonment of thirty-three years.

¶11 Sims filed a postconviction motion, pursuant to WIS. STAT. RULE 809.30 (2021-22),[1] arguing that trial counsel was ineffective for failing to

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

file a pretrial motion to suppress D.R.'s and S.H.'s identifications. Sims also argued trial counsel was ineffective for failing to investigate his alibi and present two alibi witnesses, Buck and Selena Cole (Selena). Sims attached an unsigned and unsworn affidavit from Buck to his motion.

¶12 With regard to the identification issue, the postconviction court denied Sims's claim without a hearing. The postconviction court acknowledged that Cole did not follow proper procedure in conducting the photo arrays, but found that the identifications were reliable under the totality of the circumstances. The postconviction court stated that it would not have granted a pretrial suppression motion. With regard to the alibi issue, the postconviction court rejected Sims's claim as to Buck, noting that Buck's affidavit was unsigned and unsworn, and essentially unreliable. The postconviction court also noted that Buck told a defense investigator that he did not know Sims, thus, "[c]ounsel cannot be deemed ineffective for failing to call a witness who would *not* support an alibi defense" (emphasis in original). The postconviction court granted a *Machner*[2] hearing limited to Sims's claim about trial counsel's failure to investigate Selena.

¶13 Trial counsel, Sims and Selena all testified at the *Machner* hearing. Counsel testified that Buck was the only alibi witness he genuinely considered, but that Buck failed to respond to a subpoena or counsel's messages. Trial counsel stated that he had concerns about Buck being a reliable witness, especially after Buck denied knowing Sims. Trial counsel said that Sims informed him of other potential witnesses, including a woman whom Sims identified as "Bad Ass" and

---

[2] *See* **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

for whom Sims had provided a phone number. According to counsel, the investigator linked this number to Selena, but the investigator was unable to reach Selena. Trial counsel could not recall whether he spoke to Sims about seeking an adjournment in order to track down other potential witnesses, but stated that Sims was adamant about maintaining his speedy trial rights.

¶14 Sims testified that he discussed his alibi defense with his trial counsel and that he gave counsel the names of Selena, Buck, and two other witnesses, whom he only knew by their nicknames. Sims acknowledged that the investigator told him that she could not reach Selena. While acknowledging his speedy trial demand, Sims denied telling trial counsel that he wanted to go to trial without his alibi witnesses. Sims said that trial counsel never discussed an adjournment with him.

¶15 Selena also testified, relaying the timeline for the time she spent with Sims, which included the night of the robbery and shooting. She stated that she was with Sims from 11:00 a.m. the morning of the incident, until about noon the following day, and that she stayed the night with him.

¶16 The postconviction court denied the remainder of Sims's motion, finding that Selena's timeline did not match Sims's trial testimony, particularly as to when Sims was with his son. The postconviction court stated that because Selena's testimony ran contradictory to Sims's trial testimony, trial counsel's failure to call Selena was not prejudicial to Sims's defense. This appeal follows.

**DISCUSSION**

¶17 On appeal, Sims again contends that his trial counsel was ineffective for failing to move to suppress identification evidence and for failing to call Buck

7

and Selena as alibi witnesses. Sims also contends that he is entitled to a new trial in the interest of justice.

¶18 In a postconviction motion, a defendant must allege sufficient material facts that, if true, would entitle the defendant to relief. *State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. If the defendant does so, the postconviction court must hold an evidentiary hearing on the defendant's motion. *Id.* However, if the "motion does not raise facts sufficient to entitle the [defendant] to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the [postconviction] court has the discretion to" deny the motion without a hearing or to grant an evidentiary hearing despite the deficient motion. *Id.*

### Ineffective Assistance of Counsel

¶19 "Whether counsel was ineffective is a mixed question of fact and law." *State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review" independently. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. To prove a claim of ineffective assistance of counsel, the defendant must satisfy two tests: first, that counsel's performance was deficient; and second, that counsel's deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "If the defendant fails to satisfy either prong, we need not consider the other." *Breitzman*, 378 Wis. 2d 431, ¶37.

¶20 Sims first contends that trial counsel was ineffective for failing to file a pretrial motion to suppress identification evidence derived from what he

8

contends was an impermissibly suggestive photo array. In denying Sims's postconviction motion without a hearing, the postconviction court found that under the totality of the circumstances, the evidence was reliable. The postconviction court stated that had Sims moved for pretrial suppression, the court would have denied the motion. Counsel is not ineffective for failing to file a meritless motion. *See State v. Harvey*, 139 Wis. 2d 353, 380, 407 N.W.2d 235 (1987).

¶21 Sims next contends that trial counsel was ineffective for failing to investigate and call two potential alibi witnesses: Buck and Selena. The postconviction court denied Sims's motion as to Buck without a hearing, but still heard testimony regarding the issue at the *Machner* hearing. The record supports the postconviction court's findings. Although trial counsel initially filed a notice of alibi naming Buck as a potential witness, Buck failed to respond to a subpoena and failed to respond to counsel's messages. Later, Buck told a defense investigator that he did not know Sims. The postconviction court correctly noted that counsel cannot be deemed ineffective for failing to call a witness whose testimony would not support an alibi defense. Moreover, at the *Machner* hearing counsel told the postconviction court that he had reservations about calling Buck as a witness due to Buck's unreliability. We will not second-guess trial counsel's reasonable strategy. *See Breitzman*, 378 Wis. 2d 431, ¶65.

¶22 As to Selena, the postconviction court heard testimony from trial counsel, Sims, and Selena before determining that counsel was not ineffective. Again, the record supports the postconviction court's decision. The record establishes that trial counsel did try to track down Selena with only Sims's description of "Bad Ass" and a phone number. The defense investigator could not locate her. Sims's claim that an adjournment would have allowed the defense to

9

obtain additional admissible evidence related to the alibi is speculative at best. Moreover, at the *Machner* hearing, Selena provided a timeline of events that directly contradicted Sims's trial testimony. Selena's testimony does not provide a reasonable probability of a different outcome; indeed, Selena's testimony likely would have undermined Sims's credibility. In short, trial counsel was not ineffective with regard to his investigation of Selena.

**Interest of Justice**

¶23 Sims contends that he is entitled to a new trial in the interest of justice because the real controversy of his case was not fully tried. This court may order a new trial pursuant to WIS. STAT. § 752.35 when the real controversy has not been fully tried or when it is probable that justice has miscarried. "The power to grant a new trial in the interest of justice is to be exercised 'infrequently and judiciously.'" *State v. Avery*, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). To consider whether a case is one of the few requiring discretionary reversal, this court "must engage in 'an analysis setting forth the reasons' that the case may be characterized as exceptional." *State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258 (citation omitted). In this case, we are unable to state why this case is exceptional and we conclude that the controversy was fully tried.

¶24 For the foregoing reasons, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

10