DUGAN, J.
¶1 Steven L. Buckingham appeals from the judgment of conviction, following a jury trial, convicting him of one count of first-degree reckless injury with use of a dangerous weapon, and two counts of felony bail jumping. He also appeals the order denying his postconviction motion.
¶2 On appeal, Buckingham argues that trial counsel was ineffective because trial counsel: (1) failed to object to testimony about two handguns that were unrelated to the charges; (2) failed to obtain the testimony of a police officer who would have testified that the victim initially said he did not know who shot him; (3) failed to object to an in-court identification by a witness who failed to identify Buckingham in a photo array; (4) failed to object to a detective's nonresponsive hearsay testimony that a person whose DNA was found on a T-shirt said he knew Buckingham; and (5) failed to alert the jury to the lack of corroborative evidence regarding the alleged motive for the shooting, a feud on Facebook. Buckingham maintains that he was prejudiced by each of these deficiencies and by their cumulative effect. He also contends that he is entitled to postconviction discovery.
¶3 We assume, without deciding, that the alleged failures constituted deficient performance. However, we conclude that based on the strong identification evidence Buckingham has not established that he was prejudiced by them. We also conclude that Buckingham has not established that he is entitled to postconviction discovery. Therefore, we affirm the judgment and order.
BACKGROUND
The incident and the investigation
¶4 On August 19, 2013, D.F. and his friends A.C. and A.G. were waiting at a bus stop at 51st Street and North Avenue in Milwaukee. Two men approached D.F. at the bus stop and, when they were about an arm's-length away from him, one of the men shot D.F. with a handgun.
¶5 Detective James Campbell was dispatched to the scene of the shooting and found D.F., who had a single gunshot wound to his chest. D.F. told Campbell that he did not know the name of the shooter, but he had seen him before. D.F.'s breathing became more labored and the paramedics took over.
¶6 Campbell then began interviewing witnesses and investigating nearby businesses for video footage. Campbell interviewed K.W., who witnessed the shooting from the front passenger seat of a car and gave a detailed description of the shooter and the other man.
¶7 Detective Walter Cappelli interviewed A.G., who gave a detailed description of both men. A.G. said that both men had small black semiautomatic handguns, and each man had fired one round.
¶8 Based on all the witness reports, detectives believed that the men fled north past a school that had security cameras. One witness also reported seeing a suspect discard a white T-shirt as he ran.
¶9 The video recovered from the school's surveillance cameras showed two men running from the scene. One man had an Afro and was wearing a white T-shirt and dark pants, and the other man was wearing dark pants and white tennis shoes. However, the video was too grainy to identify either man's face. Detectives also recovered the T-shirt, and it was sent for DNA testing. Detective Marco Salaam also recovered two .380 caliber shell casings from a semiautomatic weapon at the scene, and the casings were sent to the State Crime Laboratory for testing.
¶10 After D.F. was stabilized at the hospital, D.F. told the police that he did not know the shooter personally, but he knew him as Lil Lo. The morning of August 20, 2013, Detective Shannon Lewandowski showed D.F. a photo array at the hospital, and D.F. identified Buckingham as Lil Lo in the photo array and as the shooter.[1]
¶11 On August 21, 2013, Salaam showed K.W. a photo array and she identified Buckingham as the shooter. On August 21, 2013, that photo array was reshuffled and Salaam showed it to A.G.; the photo array was again reshuffled and Salaam showed it to T.A., K.W.' fiancé who was driving the car in which K.W. was riding on the day of the shooting. Neither A.G. nor T.A. identified anyone in the photo array.
¶12 On January 31, 2014, the State charged Buckingham with one count of first-degree reckless injury with use of a dangerous weapon for the incident that occurred on August 19, 2013, and two counts of bail jumping.[2] Buckingham was subsequently arrested on those charges on July 5, 2014.
The trial and eyewitness testimony
¶13 In early March 2015, the trial court presided over a four-day jury trial. Buckingham's consistent defense was that the shooting of D.F. was horrific, but he was not the shooter.
¶14 In its opening statement, the State outlined its theory of the case that Buckingham shot D.F., while D.F. and two friends, A.G. and A.C., were waiting for a bus.
¶15 In his opening statement, trial counsel told the jury that the State had the burden of proof and that Buckingham was presumed to be innocent. Trial counsel asked the jury to consider who had a motive to shoot D.F. and to consider that at the scene D.F. told Campbell that he did not know who shot him or know the man's name.
¶16 At trial, the State called thirteen witnesses, including D.F., A.C., and A.G.; Officer Campbell; Detective Salaam; a firearms and tool mark examiner from the State Crime Laboratory; and two other officers who were later involved in the discoveries of two handguns. Trial counsel called three witnesses, Campbell; Cappelli; and Detective Todd Fischer.
¶17 During his testimony, D.F. identified Buckingham as the man who shot him and stated that he had no doubt that Buckingham was the man who shot him. K.W. testified that she witnessed the shooting from the front passenger seat of T.A.'s car. She said she saw four men and a woman at the bus stop and that she saw one of the men get shot. K.W. identified Buckingham in court as the shooter. K.W. also testified that the police showed her a photo array and she identified Buckingham as the shooter in the array.
¶18 T.A.'s testimony was consistent with that of K.W., except he believed the gunman fired two or three shots. He identified Buckingham in court as the shooter. He also claimed that he made an identification of the shooter from a photo array, but on cross-examination, he admitted that he did not. Salaam also testified that T.A. did not identify the shooter in the photo array.
¶19 A.C. testified that she was standing at the bus stop with D.F. and A.G. when two black men, both with guns, approached them. She was unable to provide a more detailed description of either man. A.C. said she ran from the scene when she saw the guns and she heard, but did not see, the shooting. She said she did not see any person involved in the shooting in the courtroom. She did not know Buckingham.
¶20 A.G. testified that he saw two black men with guns approach D.F. He said he saw and heard both of them fire their guns, and then run off. A.G. remembered being shown a photo array by the police but could not identify anyone from it. He did not remember giving the police any descriptions of the men at the scene and he did not recall what the men were wearing.
¶21 In closing argument, the State told the jury that it had established that Buckingham shot D.F. for reasons that might not be clear. It summarized the evidence that supported its argument.
¶22 Conversely, in closing, trial counsel argued to the jury that the case was about identification and the State had not met its burden of proving that Buckingham was the shooter. Trial counsel argued that the State had not proved that the man wearing the white T-shirt in the video was Buckingham, emphasized testimony that supported this contention and T.A.'s initial "false testimony" on direct examination that he had identified Buckingham in the photo array, and summarized A.G.'s conflicting testimony that showed he was not credible.
¶23 The jury returned guilty verdicts on all counts. On May 8, 2015, the trial court imposed a global sentence of thirty years, consisting of twenty years of initial confinement and ten years of extended supervision.
¶24 Buckingham filed a postconviction motion alleging multiple ways, individually and cumulatively, that trial counsel had failed to provide effective representation,[3] and also sought postconviction discovery. The parties filed briefs on the motion, the trial court conducted a Machner hearing[4] and subsequently denied the postconviction motion in a written decision. This appeal followed.
DISCUSSION
I. The trial court properly found that Buckingham was not prejudiced
A. The standards of review and applicable law
¶25 The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to effective assistance of counsel. State v. Balliette , 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. Wisconsin courts apply the two-pronged test of Strickland v. Washington , 466 U.S. 668, 686 (1984), requiring that a defendant establish two elements to show that his or her counsel's assistance was constitutionally ineffective: (1) "counsel's performance was deficient"; and (2) "the deficient performance resulted in prejudice to the defense." See Balliette , 336 Wis. 2d 358, ¶21.
¶26 As to the first prong of the ineffective assistance of counsel test, "[c]ounsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." State v. Thiel , 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305.
¶27 As to the second prong of the ineffective assistance of counsel test, prejudice occurs when the attorney's error is of such magnitude that there is a "reasonable probability" that, but for the error, the outcome of the proceeding would have been different. State v. Erickson , 227 Wis. 2d 758, 769, 596 N.W.2d 749 (1999). "Stated differently, relief may be granted only where there 'is a probability sufficient to undermine confidence in the outcome,' i.e., there is a 'substantial, not just conceivable, likelihood of a different result.' " State v. Starks , 2013 WI 69, ¶55, 349 Wis. 2d 274, 833 N.W.2d 146 (citing Cullen v. Pinholster , 563 U.S. 170, 189 (2011) ).
¶28 "The standard of review of the ineffective assistance of counsel components of performance and prejudice is a mixed question of law and fact." State v. Johnson , 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). We will not overturn the trial court's findings of fact, "the underlying findings of what happened," unless they are clearly erroneous. See id. (citation omitted). However, "[t]he ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." See id. at 128. "[C]ourts may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice." Id.
B. Strong identification testimony establishes that Buckingham was not prejudiced by trial counsel's performance
¶29 We need not reach a conclusion on deficiency because we conclude that based on the following evidence, there is no reasonable probability of a different outcome in the trial.[5]
¶30 At the scene of the shooting, D.F. told Campbell that he did not know the name of the shooter, but he had seen the man before. After D.F. was stabilized at the hospital, he told police that he did not know the shooter personally, but he knew the man as Lil Lo. He also said that Lil Lo was dating D.F.'s ex-girlfriend. The morning after the shooting while D.F. was at the hospital, the police showed him a photo array and D.F. identified Buckingham as Lil Lo in the array and as the shooter.
¶31 During his testimony, D.F. identified Buckingham as the man who shot him. Buckingham was an arm's-length away from him when he was shot and D.F. said he had no doubt that Buckingham was the person who shot him. D.F. said he told police he knew Buckingham by the nickname Lil Lo. He said that he knew who Buckingham was because he had seen him at a friend's house some months before the shooting. He also said that he had an argument with Buckingham on Facebook after Buckingham began dating D.F.'s ex-girlfriend. He knew it was Buckingham's Facebook page because it had Buckingham's photograph on it. He also testified that while he was at the hospital, the police showed him a photo array and he selected Buckingham as the shooter.
¶32 K.W., the front seat passenger, gave the police a detailed description of the shooter and the other man. Two days after the shooting, the police showed K.W. a photo array and she identified Buckingham as the shooter. K.W. testified that she witnessed the shooting from the front passenger seat of T.A.'s car. She said she saw four men and a woman at the bus stop. One man began backing into the street as another man raised a gun and pointed it at him. K.W. saw the man with the gun fire a shot at the man in the street. She said the man with the gun then ran northbound with another man, and she and T.A. stopped to help D.F. K.W. identified Buckingham in court as the shooter. She testified that she was able to get a good look at Buckingham and that he was the only person she saw with a gun that day. K.W. also testified that the police showed her a photo array and she identified Buckingham as the shooter, and she was certain that he was the shooter-she had no doubt in her mind.
¶33 In its written decision following the Machner hearing, the trial court found that the trial testimony of D.F. and K.W. was "especially convincing."
¶34 Additionally, the jury was aware that Buckingham twice fled the police when they tried to apprehend him after the shooting. During the second attempt to apprehend him, Buckingham gave the police a false name and fled the scene. See State v. Quiroz , 2009 WI App 120, ¶18, 320 Wis. 2d 706, 772 N.W.2d 710 (stating that "[t]he fact of an accused's flight is generally admissible against the accused as circumstantial evidence of consciousness of guilt and thus of guilt itself").
¶35 Having concluded that the strong evidence noted above establishes that Buckingham was not prejudiced by any of his allegations of deficient performance by trial counsel, we address each of Buckingham's individual arguments that trial counsel was ineffective and explain why he was not prejudiced by any of them.
C. Buckingham was not prejudiced by trial counsel's failure to object to testimony about the two handguns
¶36 Buckingham maintains that trial counsel should have objected to trial testimony about two handguns-(1) a .380 semiautomatic Bersa pistol that Officer Michael Wawrzyniakowski seized on September 1, 2013, and (2) a .40 caliber black handgun that Officer Andrew Holzem found on July 5, 2014, on the floor of the car where Buckingham had been sitting. With respect to the .380 semiautomatic Bersa, Buckingham states that the testimony "suggest[ed] a link between ... Buckingham and a gun of the very same type used to wound D.F." and that the jury "may very well have bought into the State's propensity inference-that ... Buckingham is the type of young black man to have ready access [to] guns on the streets of Milwaukee." He makes a similar propensity argument regarding the .40 caliber handgun, adding that the jury was never told that such handgun did not match the crime weapon. He then argues that there is a reasonable probability of a different outcome if the jury had not heard the evidence about the two handguns. We disagree.
¶37 Wawrzyniakowski testified that on September 1, 2013, while assisting in a search for Buckingham who "was wanted for some sort of firearms offense" and had been seen in the vicinity, he was directed to search a residence. During the search, Wawrzyniakowski found a .380 Bersa semiautomatic handgun in the attic sitting on some insulation. Wawrzyniakowski testified that there were three or four individuals in the home, none said they owned the gun, and he could not say if Buckingham had ever been inside the home. The State's firearm's expert, Mark Simonson, examined the two .380 Bersa casings found at the scene of the shooting and the .380 Bersa handgun seized on September 1, 2013, and test-fired that handgun. He testified that the casings recovered from the scene had not been fired from the handgun he had tested.
¶38 Regarding the second handgun, Holzem testified that, on July 5, 2014, he and his partner conducted a traffic stop of a four-door Chevrolet Impala that had been speeding. Buckingham, who was seated in the rear passenger seat, provided a false name and fled the scene. The police eventually apprehended Buckingham. Some time later that day after the police had apprehended Buckingham, Holzem saw a black handgun in plain view on the floorboard of the rear seat of the car where Buckingham had been sitting.
¶39 In its written decision following the Machner hearing, the trial court addressed the handgun evidence. The trial court found that "no attempt [was] made by the State to connect [Buckingham] to this gun" and that the evidence was simply "a description of the efforts made to arrest [Buckingham.]" It further stated that there was "little or no nexus to [Buckingham] in either circumstance" and that there were other individuals around in each instance. The trial court concluded that "this evidence could not have made a difference" in the outcome of the proceedings.
¶40 On appeal, Buckingham has not even attempted to show that the trial court's factual findings are clearly erroneous. We conclude that they are supported by the record. Here, no evidence was introduced by the State to connect Buckingham to either gun. In fact, the State presented ballistics evidence that the Bersa handgun that the police recovered on September 1, 2013, was not the gun that was used to shoot D.F. In closing, the State also reminded the jury that despite extensive testing, it had not established any nexus between the Bersa pistol and the crime that Buckingham was charged with. Buckingham's arguments about the jury using the handgun evidence as propensity evidence are speculative.
¶41 Moreover, the focus of the defense at trial was on the identification of Buckingham as the shooter. Having considered the legal issue independently of the trial court, we conclude that Buckingham has not shown a reasonable probability that without the evidence regarding the two handguns, the outcome of the trial would have been different, particularly in light of the strong identification evidence noted above. See Erickson , 227 Wis. 2d at 769.
D. Buckingham was not prejudiced by trial counsel's failure to obtain a police officer's testimony about D.F.'s inability to identify the shooter while D.F. was in the ambulance
¶42 Buckingham maintains that trial counsel should have obtained the testimony of Officer Daniel Reilly, who rode to the hospital with D.F. in the ambulance and stated that he asked D.F. if he knew who had shot him, to which D.F. replied, "I don't know." Reilly also stated that D.F. said that he neither knew the men nor had a prior confrontation with the men.
¶43 Buckingham asserts that the information provided in Reilly's report directly contradicts D.F.'s trial testimony that he told the police that Buckingham shot him, that he knew Buckingham before the shooting, and that he had an argument with Buckingham sometime prior to the shooting. He maintains that had trial counsel presented this testimony, there is a reasonable probability of a different outcome.
¶44 In addressing this issue, the trial court found that Reilly also stated that D.F. was having trouble breathing and was "in and out of consciousness." It also found that Campbell, the first officer at the scene, testified that D.F. told him that he "did not know the name of the person who shot him, however, he had seen the person before." Additionally, at one point, Campbell thought D.F.'s injuries were so serious that he informed D.F. that he might not live.
¶45 The trial court noted that under the circumstances, it was a "reach" to expect much from a shooting victim. In addition, the trial court noted that when D.F. was later asked at the hospital about the shooter's identity, he identified the shooter by his nickname Lil Lo, which is Buckingham's nickname. It also relied on K.W.'s positive identification of Buckingham as the shooter, finding that "[h]er testimony was persuasive and provided the jury with additional grounds to find that [Buckingham] was the shooter beyond a reasonable doubt." The trial court also held that the trial testimony of both K.W. and D.F. was "especially convincing."
¶46 We will not disturb these credibility findings on appeal. See State v. Turner , 114 Wis. 2d 544, 550, 339 N.W.2d 134 (Ct. App. 1983) (stating that "[w]hen required to make a finding of fact, the trial court determines the credibility of the witnesses and the weight to be given to their testimony and its determination will not be disturbed by this court on appeal where more than one inference may be drawn from the evidence"). See also WIS. STAT. § 805.17(2) (2015-16)[6] (stating that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses") (made applicable to criminal proceedings by WIS. STAT. § 972.11(1) ).
¶47 The trial court concluded that even if Reilly had testified about D.F.'s statement in the ambulance, based on Campbell's testimony and the deterioration of D.F.'s condition in the ambulance when Reilly attempted to speak to him, there would not have been a reasonable probability that the outcome of the proceeding would have been different.
¶48 Buckingham's prejudice argument is conclusory and speculative. Buckingham has not endeavored to show that any of the trial court's underlying factual findings are clearly erroneous. He merely disagrees with the trial court's conclusion based on those facts.
¶49 Thus, based on the trial court's findings, we agree with the trial court's conclusion that Buckingham has not established that if Reilly had testified, the outcome of the proceeding would have been different, particularly in light of the strong identification evidence noted above. See Erickson , 227 Wis. 2d at 769.
E. Buckingham was not prejudiced by trial counsel's failure to object to T.A.'s in-court identification
¶50 Buckingham asserts that trial counsel should have objected to T.A.'s in-court identification of Buckingham as the shooter. He makes the conclusory argument that because he was seated next to trial counsel at the defense table and T.A. could not identify him in a photo array, the identification was suggestive. However, nothing about that description shows that the identification was unfairly suggestive. See Perry v. New Hampshire , 565 U.S. 228, 244 (2012) (stating that "[m]ost eye witness identifications" and "all in-court identifications" involve "some element of suggestion").[7] Therefore, we conclude that Buckingham has not established that trial counsel was deficient.
¶51 Further, Buckingham contends that he was prejudiced because without T.A.'s identification of Buckingham as the shooter, "the competing evidence is in seeming equipoise [equally balanced]." He states that D.F. and K.W. identified him, and A.C. and A.G. did not. Buckingham's claim of prejudice is speculative and not accompanied by citation to legal authority. Moreover, he does not develop the argument and, therefore, we may properly decline to address it. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).
¶52 Moreover, Buckingham's trial counsel thoroughly cross-examined T.A. and impeached his testimony by having him admit that he could not identify Buckingham in the photo array. Trial counsel also elicited several statements from T.A. that conflicted with his earlier statement to police and the descriptions that he gave of the two men. Trial counsel's cross-examination elicited facts that allowed him to argue that none of T.A.'s identifications were reliable, including arguing that T.A. lied when he testified that he identified Buckingham in the photo array.
¶53 Additionally, the State elicited testimony from Salaam, the officer who found the shell casings at the scene, that T.A. was "unable to make a positive identification" from the photo array and that T.A. "was wrong when he said that he made an identification" the preceding day. During its closing, the State further stated that T.A. had not identified Buckingham in the photo array. The jury was aware that trial counsel's cross-examination of T.A. undermined his credibility.
¶54 The trial court held that even if T.A.'s in-court identification had been stricken, there was no reasonable probability that the outcome of the trial would have been different because of the strong identifications of Buckingham as the shooter by D.F. and K.W.[8]
¶55 We agree with the trial court's conclusion and, therefore, conclude that Buckingham has not shown that without T.A.'s in-court identification of him there is a reasonable probability that the outcome of the trial would have been different.
F. Buckingham was not prejudiced by trial counsel's failure to object to non-responsive hearsay testimony
¶56 Buckingham also contends that trial counsel should have moved to strike nonresponsive hearsay testimony from Salaam that Paul Nelson, whose DNA was found on the white T-shirt, said he knew Buckingham. Buckingham asserts that the failure to object to Salaam's statement prejudiced him. Buckingham maintains that in this single exchange, Nelson went from being a possible alternative suspect to a probable accomplice of Buckingham.
¶57 The question and answer at issue are:
[STATE]: Were any results or was any DNA recovered that linked to [ ] Buckingham?
[SALAAM]: The DNA on the shirt: The person who the DNA came back on the shirt [Paul Nelson] was arrested and interviewed and [he] admitted to knowing [ ] Buckingham.
Noting that Nelson was not called as a witness, the trial court held that based on the overall evidence adduced at trial, it did not find that there was a reasonable probability that a different result would have been reached by the jury if Salaam's response had been stricken. Further, the trial court held that in the context of a four-day jury trial "one brief remark like this would not have been a difference maker."
¶58 Further, the State presented testimony that the police interviewed Nelson and he did not know anything about the case, other than providing contradictory information about whether he knew Buckingham and a young lady, and whether they were a "couple." These facts were reiterated in the State's closing, when the State indicated that the DNA of another individual, Nelson, came up on the T-shirt, the police interviewed that person, and he was cleared regarding the offense. In other words, the State's case included eliminating Nelson as a possible suspect.
¶59 We conclude that even if Salaam's testimony that Nelson stated that he knew Buckingham was stricken, there was no reasonable probability that the outcome of the trial would have been different, particularly in the light of the strong identification evidence noted above. See Erickson , 227 Wis. 2d at 769.
G. Buckingham was not prejudiced by trial counsel's failure to place more emphasis on the State's failure to introduce Facebook evidence
¶60 Buckingham argues that the State "insisted" in its opening statement that this case was about a Facebook feud that spilled into the real world. He then asserts that trial counsel was well aware that the State tried and failed to collect records that would corroborate that theory. Buckingham then argues that trial counsel was deficient for failing to present such evidence that would undercut the State's motive theory for why Buckingham allegedly shot D.F.
¶61 However, Buckingham overstates the importance of the State's reference to Facebook in its opening statement. The State said the following:
Now, you'll hear a little bit about the possible motive. Now, the State doesn't have to prove motive. But you will hear, and it will come out regarding a possible motive here. Probably as old as history itself, it's over a friendship that [D.F.] used to have with a female ex-girlfriend, and [Buckingham] is the new boyfriend.
And as dumb as that seems-[a]nd I could use stronger words than dumb, but I've never been able to understand it. It has to do with arguments, things that were posted on [F]acebook.
¶62 The State began by saying that it did not have to prove motive, but that the jury would hear about a possible motive-the State never "insisted" that this case was about a Facebook feud that spilled into the real world. It went on to State that "as old as history itself," this case involved a feud between an ex-boyfriend and new boyfriend of the same woman. Only then did the State mention arguments on Facebook.
¶63 The trial court described the State's comment about Facebook as a "passing reference." We agree. Based on the evidence introduced, the jury knew that Buckingham was dating D.F.'s ex-girlfriend-that alone would suggest a motive. We conclude that even without the passing reference to an argument on Facebook there would be no reasonable probability that the outcome of the trial would have been different, particularly in light of the strong identification evidence noted above.
H. Cumulative effect of these deficiencies
¶64 Buckingham asserts that but for trial counsel's errors, there is a reasonable probability of a different outcome because the jury would have heard about D.F.'s responses to Reilly in the ambulance, would not have heard the testimony about the two handguns and the testimony about Nelson, and would not have considered T.A.'s in-court identification.[9] We have carefully considered Buckingham's assertion of cumulative prejudice due to the five claimed errors. However, we are not persuaded that they give rise to a reasonable probability of a different outcome.
¶65 Therefore, we uphold the trial court's rejection of Buckingham's ineffective assistance of counsel claim on the ground that he has not shown he was prejudiced as a result of these claimed deficiencies whether considered individually or cumulatively.
II. The trial court properly found that Buckingham was not entitled to postconviction discovery
¶66 Buckingham seeks postconviction discovery in the form of Facebook records from D.F.'s ex-girlfriend. He argues that at trial, the State alleged that there was a motive for the shooting-a feud on Facebook-and the fact that there is now no way to verify that claim is extremely relevant to his defense. He asserts that if further Facebook records exist, then they are clearly relevant to an issue of consequence-in this case, they go directly to his motive, or lack thereof.
¶67 The State counters that it is not obligated to provide Buckingham with records that are not within its possession. It states that D.F.'s ex-girlfriend's Facebook was taken down and, therefore, it subpoenaed Facebook for the records. However, the only records Facebook provided related to D.F.'s Facebook page-not the ex-girlfriend's page-and all those records have been turned over to Buckingham.
A. The applicable law and standard of review
¶68 A defendant has a right to postconviction discovery if the defendant establishes that the sought after evidence is relevant to an issue of consequence. State v. O'Brien , 223 Wis. 2d 303, 320, 588 N.W.2d 8 (1999).
[E]vidence is [consequential] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Evidence that is of consequence then is evidence that probably would have changed the outcome of the trial.
Id. at 320-21 (brackets in original; footnote, citations, and one set of quotation marks omitted). Further, "[t]he mere possibility that an item of undisclosed information might have helped the defense ... does not establish '[a consequential fact]' in the constitutional sense." Id. at 321 (brackets in original; citation omitted). O'Brien indicates that the court regarded this as a factual issue: "Essentially, the circuit court found that the result of the trial would not have been different because the evidence was not material. We will not disturb a circuit court's findings regarding evidentiary facts unless they are clearly erroneous." Id. at 322.
B. The requested Facebook records are not of consequence
¶69 The requested Facebook records are not of consequence. As we discussed above, the issue of motive was not of consequence in the outcome of the trial. Although the State made reference to motive and mentioned a Facebook argument, the trial court found that it was only a passing reference. We also conclude that even without the passing reference to an argument on Facebook, there would be no reasonable probability that the outcome of the trial would have been different.
¶70 Therefore, Buckingham was not entitled to the postconviction discovery he requests.[10]
CONCLUSION
¶71 We conclude that Buckingham failed to establish his ineffective assistance of counsel claim because, under the circumstances of this case, Buckingham was not prejudiced by these alleged deficiencies, individually or cumulatively. We also conclude that the trial court properly determined that Buckingham did not establish that he is entitled to postconviction discovery. Therefore, we affirm the judgment and order.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

The record includes several spellings of Buckingham's nickname. In this opinion, we use Lil Lo.

Buckingham does not raise any issues before this court that call into question his bail jumping convictions. He also did not raise any issues regarding them before the trial court.

In his postconviction motion, Buckingham's ineffective assistance of counsel claim included other alleged deficiencies. However, he does not pursue them on appeal and, therefore, they are not germane to this appeal.

See State v. Machner , 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

As an appellate court, we decide cases on the narrowest possible grounds. See State v. Blalock , 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989).

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

In addressing Buckingham's argument, the trial court stated that courts usually hold that issues similar to the in-court identification issue Buckingham raised are issues for the jury to sort out. It also stated that a two-dimensional photo lineup and an in-court identification are different and independent of each other. The trial court's statements suggest that it would have overruled any objection to the in-court identification. Trial counsel is not ineffective for failing to make an objection that would have been overruled. See State v. Harvey , 139 Wis. 2d 353, 380, 407 N.W.2d 235 (1987).

We also note that the State did not mention T.A.'s in-court identification in its closing argument and that the State emphasized T.A.'s inability to identify anyone in the photo array as indicative of the fairness of the photo array.

In arguing the cumulative effect of the errors, Buckingham does not include the Facebook argument, but since the omission was apparently inadvertent, we have considered all five alleged errors.

In response to the State's assertion that it turned over all the documents it received from Facebook regarding its subpoenas, Buckingham argues that if the State received a confirmation from Facebook that no such records were available that would be a record. Buckingham's argument is conclusory and assumes that Facebook provided such a document. The State has responded that it has turned over all the documents that it received from Facebook in response to any subpoenas-that response is sufficient.