STATE of Wisconsin, Plaintiff-Respondent,

v.

Pablo G. QUIROZ, Defendant-Appellant.

Court of Appeals

*Nos. 2008AP1473–CR, 2008AP1474–CR.*
*Submitted on briefs March 5, 2009.—Decided July 1, 2009.*

2009 WI App 120

(Also reported in 772 N.W.2d 710.)

On behalf of the defendant-appellant, the cause was submitted on the brief of *Glen B. Kulkoski* of *Carr, Kulkoski & Stuller, S.C.*, New Berlin.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Rebecca Rapp St. John*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Anderson, P.J., Snyder and Neubauer, JJ.

¶ 1. ANDERSON, P.J. Pablo G. Quiroz appeals from his judgment of conviction for two counts each of second degree sexual assault of a child contrary to WIS. STAT. § 948.02(2) (2001–02)[1] and child sexual exploitation[2] contrary to § 948.05(1)(a). Quiroz argues that, because he offered an independent reason for absconding, it was error for the trial court to allow evidence of his absconding and to give the jury a flight instruction, leaving Quiroz to explain his flight motivation to the jury, in turn causing him unfair prejudice. We disagree and affirm the trial court.

¶ 2. *Background:* In 2002, after Quiroz was charged with two counts each of sexually assaulting and sexually exploiting a minor, he was released on bond; he was arrested again for other charges; in August 2002, he was again released on bond. Thereafter, he jumped bail; he went first to Mexico and then to Canada. He remained on the run until December 2005, when he was arrested by Canadian immigration in Montreal, Canada. After extradition, he was turned over to the Sheboygan County Sheriff's Department in October 2006.

¶ 3. *Facts:* Before Quiroz's trial, the State moved for Wisconsin's flight instruction[3] to be given, and Quiroz moved for an order that "[n]o evidence of flight

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[2] While the information and charging documents, along with the trial court's judgment, use the term "sexploitation" we urge the State and trial courts to use the terminology as it is stated in WIS. STAT. § 948.05:   "sexual exploitation," rather than the colloquial.

[3] WISCONSIN JI—CRIMINAL 172 (2000) provides:

Evidence has been presented relating to the defendant's conduct after the defendant was accused of the crime. Whether the

be admitted." The trial court considered the motions at two hearings, after which it granted the State's motion and denied in part Quiroz's motion. It held that the State could introduce evidence of Quiroz's flight, but that the details of other charges Quiroz claimed were the reason he fled could "not be gone into." During trial, the only references to the other charges were those made by Quiroz stating he fled because he was arrested for "more charges" after he posted bail for the sexual assault and exploitation charges.

¶ 4.   The two-day trial began on March 7, 2007. The flight evidence was presented in three ways at trial:   five stipulations about the details of Quiroz's flight, two extradition documents, and Quiroz's own testimony about the details of and reasons for his flight. We delve into the flight issue after relating the relevant facts.

¶ 5.   A.S. was nineteen years old when she testified to the following at Quiroz's trial. In April 2002, at age fifteen, she lived with her mother, her stepfather Quiroz, her brother and her little sister. Sometime in April 2002, she was in her basement bedroom with her friend N.W. when Quiroz called her upstairs and told her they had to take N.W. home because he wanted to talk. After they drove N.W. home and returned to the empty house, Quiroz told A.S. that he wanted her to put on a dress and thong underwear that he had picked out and to meet him upstairs. He said he "needed to do this one more time." She said he gave her "an ultimatum":   if she did not do it, he would tell her mother that she and her boyfriend had engaged in sexual activity; additionally, he would harm her mother.

evidence shows a consciousness of guilt, and whether consciousness of guilt shows actual guilt, are matters exclusively for you to decide.

¶ 6.    She dressed as Quiroz told her and they went into her sister's bedroom. Quiroz brought out a video camera, had her lie on a bed with her legs open and began to videotape her. While taping, Quiroz started rubbing her "vagina area" and then took off her underwear. He also touched her breasts, first while they were covered then after exposing them. Quiroz was dressed in loose fitting shorts and A.S. could see his penis was fully erect under the shorts. He eventually put the camera down and performed oral sex on her while continuing to fondle her. She could see he had ejaculated because his light gray shorts had turned dark around his penis area.

¶ 7.    A second incident occurred approximately two weeks later in which Quiroz told A.S. "this is the last time." He told her he "just needs to get this out of his system," and he needed her "to do this for him." Like before, Quiroz had A.S. put on a dress and thong underwear and they went into a bedroom. Quiroz again videotaped her. While taping, he removed her thong underwear and spread open her vagina with his fingers. She could see he was erect in his shorts and this time he took his penis out of his shorts and exposed himself to her. He held his penis out and told her that he would like to have sex. He told her she "won't have to worry about getting pregnant, and it won't hurt." A.S. told him "no."

¶ 8.    After A.S. told Quiroz "no," he continued to touch himself and tried to force intercourse. In the middle of this, AS heard someone arrive home; she then told Quiroz that either he gets off of her or she is going to scream. He then got off and left the bedroom. Two to three weeks later A.S. moved out of the house and moved in with her uncle.

711

¶ 9. After moving out, A.S. did not return to the house until that summer when her mother, Patricia M., invited her and her friends over for a cookout. During this cookout, Patricia told A.S. that she and Quiroz were getting a divorce and that Quiroz had moved out of the house into an apartment. Patricia also told A.S. that when she was at Quiroz's apartment she found pornographic videotapes.[4] A.S. immediately assumed the tapes her mom found were the tapes Quiroz had made of her during the sexual assaults. As a result of this assumption, A.S. testified that she told her mom the "whole situation":

> I end[ed] up telling [my mom] the whole situation, and how [Quiroz] had molested me. And my mom ends up acting hysterical and crying, and we end up calling her lawyer . . . and then from there we end up calling the police department. And in a matter of four-five minutes we were down at the station.

¶ 10. Patricia corroborated her daughter's testimony. She testified that on the day of the cookout, she told A.S. that she saw pornographic tapes in Quiroz's apartment and that she "questioned" one of these tapes and had put it in the player "to see." Patricia said that as she told A.S. about questioning one of the tapes and putting it in the player, A.S. "started screaming and crying and asking me if I had seen it." She told her daughter "no." Patricia said A.S. was hard to understand and continued to scream and cry as she tried to tell her that she had not actually viewed the tape. As A.S. kept screaming and crying, she told her mother she "was videoed" and that it was her in the tape. She

---

[4] Patricia had occasion to be in Quiroz's apartment when she would pick up and drop off their young daughter, A.S.'s half-sister.

712

continued to ask her mother if she had seen the videotape. Patricia told her she had not. Patricia said that the same day A.S. told her she was in the tape, she contacted her divorce attorney to get advice as to what to do. Also that same day, Patricia called police and accompanied A.S. to the police station where they both gave a statement.

¶ 11.  A.S.'s friend, N.W., testified. She, too, corroborated A.S.'s statement and trial testimony. She said that in 2002, when she was over at A.S.'s home in her basement bedroom, Quiroz called A.S. upstairs; she heard the two of them arguing upstairs mostly in Spanish which she did not understand; N.W. waited for about one hour in the basement while they argued and, finally, went upstairs to see what was going on. She saw that A.S. was "crying" and "really upset." The only thing A.S. told N.W. was that they had to take her home, which they did thereafter. In N.W.'s July 19, 2002 statement made to police, N.W. stated that a day or two before coming in to give her statement, A.S. had told her Quiroz sexually assaulted her.

¶ 12.  City of Sheboygan Police Detective Charlet Endsley testified that as part of her investigation of the case, she conducted a one-party consent recorded telephone conversation from A.S. to Quiroz on July 18, 2002. The transcript of which was in evidence. In this conversation, A.S. asked Quiroz if "that video's gone?" He replied:  "Yeah, it's completely destroyed." The conversation continued:

[Quiroz]:  What's wrong?

[A.S.]: [] I have to live with it every day knowing that you did that.

[Quiroz]: What you want me to do about it.

713

[A.S.]: There is nothing you can do about it now, but just the fact that you did touch me, it's just gross. And I just, whatever.

[Quiroz]: Where are you? Why, why you call me and tell me this? What is behind this one?

[A.S.]: What?

[Quiroz]: Somebody else is behind this one.

[A.S.]: Behind, no, I'm making sure mom doesn't see this video. You know I told you I didn't want mom to see this.

[Quiroz]: [] you know it's, it's really dangerous when you call me and ask me that, that kind of stuff. Don't worry about it. Like I told you, I don't want to get in trouble. And I know that is trouble, and that nothing's gonna happen. And I going to be honest with you and I really appreciate like you say, you don't say anything, okay? I mean, I'm not afraid of anything, I mean whatever happens I feel so sorry, I told you. I don't mean to do anything. I was completely wrong, completely stupid. Now, I'm on my own and I realize a lot of things and, uh, I feel like shit, honestly. You know, that's what, that when I go by you I feel so embarrassing . . . .

. . . .

But every time I want to see you . . . I want to talk to you about this. But not by phone??? But I know you don't want to see me, you don't want to talk to me, which mean is fine.

. . . .

But, just for you this, okay? Nobody gonna know and nobody gonna find out anything . . . .

¶ 13.   On the day the conversation was recorded, Endsley later interviewed Quiroz at the Sheboygan

police department. When she asked him about A.S.'s allegations, he denied them. When Endsley told Quiroz that she had, in fact, been listening to the phone call and heard A.S. say on the phone call that he touched her, Quiroz denied hearing A.S. say this. He also told Endsley that the videotape he told A.S. he had destroyed and not to worry about was an adult pornographic video that A.S. had walked in on him watching. Endsley said she did not recall if Quiroz gave an explanation as to why it would be necessary to get rid of a legal, adult, sexually explicit tape simply because A.S. had walked in while he was viewing it.

¶ 14. Detective Joel Clark testified that in going through Quiroz's tapes to determine what was on them, he viewed a video Quiroz had made of A.S. as she got out of a swimming pool wearing a two-piece bikini, in which the "camera [wa]s manipulated and swooped in on her bikini buttocks, and that [wa]s the only thing in the frame of the camera." Quiroz admitted to the officer that he viewed A.S. in a sexual way, but said that he would never touch her.

¶ 15. Quiroz testified on his own behalf and reiterated his earlier explanation to Endsley of his taped conversation with A.S. He denied sexually assaulting and videotaping A.S. He admitted making the video of A.S. in her bikini which closed in on her buttocks. When asked about the one-party consent call on July 18, 2002, between himself and A.S., Quiroz stated that he thought A.S. was talking about a "commercial pornographic tape" during that call. He said that A.S. "walked in and she saw me watching the video. Because she also respect me, because of the way I am, I was embarrassed because she never saw me watching pornographic videos." He claimed he threw away that tape because he was afraid Patricia would try to take custody of their

younger daughter from him because she was angry about him watching pornography.

¶ 16. He acknowledged, however, that when the police searched his apartment, they found a number of pornographic tapes. When Quiroz was asked why he was not afraid of those tapes being discovered and causing him to lose custody, he answered because "I get those tapes after we were getting divorced." When asked why he jumped bail and absconded, he said because the "way the police was proceeding to arrest me." When asked what he meant by this, he explained:

> Well, because first of all when one night they came to my apartment and say I was under arrest for sexual assault . . . it was . . . like six comes and they take me into custody. And they put me in custody and they put me $5,000 cash bond, which money I pay.
>
> When I wasn't home not even an hour later . . . I was in the shower when they knock on the door again, really loud, and when I opened they don't step in—they step inside so all of the cops get in. They come to arrest me. I say I don't escape from jail . . . . They say no, you have another charge. Another charge for what? And one the cops told me, you have a lot of charges so don't worry about it. We're going to try to keep you in jail.

¶ 17. On cross-examination, Quiroz testified further regarding his bail jumping and four to five year absence:

> [State] You said that you were arrested by police and I thought you said . . . that one of the reasons you ran was because of the way police proceed or something?
>
> [Quiroz] Arrest me.
>
> [State] They arrested you?
>
> [Quiroz] Yes.

[State] So you were arrested. You had to post $5,000 cash . . . .

And then you posted that bond. And then you were arrested on other charges and you went in front of a judge or court commissioner, correct, and you were required to post $2500 cash?

[Quiroz] Yes.

[State] And you did post that?

[Quiroz] Yes.

[State] And you were released . . . . For the first cash bond you were released on July 22nd of 2002, and on the $2500 cash bond you were released on August 2nd of 2002?

. . . .

[Quiroz] Yes. I believe so.

[State] So you had posted a total of $7500, correct?

[Quiroz] Correct.

[State] And you left that behind and forfeited it because the police arrested you twice?

[Quiroz] Just because I was scared. Like I told you, actually the way they told me they had come for arresting me. When they arrest me for second time I wasn't expecting they were going to arrest me when the police told me you got more charges. I was thinking like, okay, every time I'm going to be out of jail they're going to come and get me some time. That's why I say forg[e]t it, I'll get out of here.

[State] And by doing that you actually accomplished what Patty couldn't. You removed yourself from your newborn daughter's life for almost five years.

717

[Quiroz] Yes. Yes.

[State] So the very thing you were afraid of happening happened, not because of Patty but because you took off for five years. Is this a fair statement?

[Quiroz] That's a fair statement.

¶ 18. *Law and Discussion:* It is well established that evidence of flight has probative value as to guilt. *See State v. Knighten*, 212 Wis. 2d 833, 838–39, 569 N.W.2d 770 (Ct. App. 1997). Analytically, flight is an admission by conduct. *State v. Miller*, 231 Wis. 2d 447, 460, 605 N.W.2d 567 (Ct. App. 1999). The fact of an accused's flight is generally admissible against the accused as circumstantial evidence of consciousness of guilt and thus of guilt itself. *Id.* To be admissible, the defendant's flight need not occur immediately following commission of the crime. *See Gauthier v. State*, 28 Wis. 2d 412, 419–20, 137 N.W.2d 101 (1965) (defendant escaped from custody while awaiting trial).

¶ 19. Wisconsin Stat. § 904.03 establishes our rule regarding exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. It states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Sec. 904.03.

¶ 20. Our inquiry into whether a trial court properly exercised its discretion in making an evidentiary ruling is highly deferential. We affirm evidentiary rulings on relevancy unless the trial court has abused its

718

discretion. *State v. Vander Linden*, 141 Wis. 2d 155, 163, 414 N.W.2d 72 (Ct. App. 1987). "The question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court properly exercised its discretion." *Id.* The test is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was, in fact, exercised. *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). We will not find an erroneous exercise of discretion if there is a rational basis for a circuit court's decision. *State v. Hammer*, 2000 WI 92, ¶ 43, 236 Wis. 2d 686, 613 N.W.2d 629.

██

¶ 21.   Quiroz claims that under *Miller*, 231 Wis. 2d at 460, there is an automatic exception to the trial court's discretionary ability to admit flight evidence whenever a defendant has an independent reason for flight that, if admitted, would unduly prejudice the defendant. Relying on his interpretation of *Miller*, Quiroz argues that the evidence of his flight was inadmissible because he proffered an independent reason for flight.

¶ 22.   First, we note that we agree with the State that there is a question, as an initial matter, about whether Quiroz has really set forth an independent reason for fleeing. In explaining his flight, Quiroz testified that he did not like the way the police "proceed[ed] to arrest" him and then described the way the police arrested him for the sexual assault charges, the subject of *this case*.[5] He also testified that he ran "[j]ust because I was scared." The reason Quiroz fled seems not entirely independent of the sexual assault charges; his

---

[5] "Well, because first of all when one night they came to my apartment and say I was under arrest for sexual assault . . . it was . . . like six comes and they take me into custody."

explanation implies a fear of piling on and that he was "scared" of more charges for the same conduct:

> Like I told you, actually the way they told me they had come for arresting me. When they arrest me for second time I wasn't expecting they were going to arrest me when the police told me you got more charges. I was thinking like, okay, every time I'm going to be out of jail they're gonna to come and get me some time. That's why I say forg[e]t it, I'll get out of here.

¶ 23. That said, assuming without deciding that Quiroz's reason for flight was independent, his argument that the flight evidence and instruction was inadmissible because he has offered an independent reason for flight does not persuade this court. Specifically, Quiroz relies on two cases out of Mississippi and referenced in our *Miller* decision: *Liggins v. State*, 726 So. 2d 180, 183 (Miss. 1998), and *Fuselier v. State*, 702 So. 2d 388, 390 (Miss. 1997), to support his contention that the evidence of his flight was inadmissible because he had an independent explanation for it. We grant that Quiroz's interpretation of the Mississippi case law on flight is not inaccurate; these cases are part of a body of case law from Mississippi in which Mississippi courts have recognized an independent-reason exception to the general rule that flight evidence is admissible to prove consciousness of guilt.

■

¶ 24. However, Quiroz's interpretation of Wisconsin case law and specifically our citation to *Liggins* in *Miller* is not accurate. Our citation to *Liggins* does not elevate it to binding precedent in Wisconsin as Quiroz seems to believe. *See State v. Muckerheide*, 2007 WI 5, ¶ 7, 298 Wis. 2d 553, 725 N.W.2d 930. Indeed, although a Wisconsin court may consider case law from other jurisdictions, such case law is not binding precedent in

Wisconsin, and a Wisconsin court is not required to follow it. *Id.*

¶ 25. In *Miller*, we considered *Liggins*—i.e., case law from another jurisdiction—and referred to its holding as an example of when prejudice could outweigh probative value if evidence of flight is admitted: "Evidence of flight is inadmissible where there is 'an independent reason for flight known by the court which cannot be explained to the jury because of its prejudicial effect upon the defendant.' " *See Miller*, 231 Wis. 2d at 460. In citing *Liggins*, we in no way adopted an automatic exception to the standard balancing of probative value with risk of unfair prejudice that is to be applied to all evidence.

¶ 26. In fact, in *Miller* we implicitly rejected the type of automatic exclusion Quiroz claims by upholding the trial court's discretionary decision to admit flight evidence, even though the defendant could point to an unrelated offense. *See Miller*, 231 Wis. 2d at 460–61. There, the defendant shot and killed someone during a drug-sale-gone-bad; and then, in a separate incident three days later, Miller fled when police pulled him over for driving without proper registration. *Id.* at 453. Miller was charged with homicide and kidnapping for the first incident and with fleeing and reckless endangerment for the second. *Id.* The trial court severed the charges but admitted evidence of the flight in the trial for the homicide and kidnapping charges. *Id.* at 459–60. Miller claimed the flight evidence was inadmissible other acts evidence. *Id.* at 462. We disagreed, affirming the trial court. *Id.* We explained that rebuttal evidence that the defendant fled because of an unrelated crime "would not have represented an independent reason for flight that could not be explained to the jury due to its prejudicial effect." *Id.* at 460–61.

¶ 27. Our holding in *Miller* defeats rather than bolsters Quiroz's argument. Flight evidence is *not* inadmissible anytime a defendant points to an unrelated crime in rebuttal. Rather, when a defendant points to an unrelated crime to explain flight, the trial court must, as it must with all evidence, determine whether to admit the flight evidence by weighing the risk of unfair prejudice with its probative value. WIS. STAT. § 904.03. As in *Miller*, the trial court performed the proper balancing test and determined that the independent reason for flight was not unduly prejudicial. It held hearings on the flight motions and the record reflects a rational process in its decision to admit the flight evidence and instruction. In determining that the State could introduce evidence of Quiroz's flight, it made efforts to minimize the prejudicial effect by also ruling that the details of the other charges, proffered by Quiroz as his independent reason for flight, could "not be gone into." Thus, during trial, the only references to the other charges were those made by Quiroz stating he fled because he was arrested for "more charges" after he posted bail for the sexual assault and exploitation charges. The record reflects the trial court's careful rationale. The admission of the flight evidence and instruction was a well-considered and proper exercise of the trial court's discretion.

¶ 28. Further, we agree with the State that even if the admission of the flight evidence had been erroneous, it would have constituted harmless error.[6] The

_____

[6] "No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of . . . the improper admission of evidence . . . unless in the opinion of the court to which the application is made, after an examination of

evidence of Quiroz's guilt was overwhelming. We provided a thorough recitation in the fact section of this evidence and need not repeat it here. Suffice to say that the flight evidence, which was presented in a limited manner and only included two general references by Quiroz to other charges, was not a determinative piece to the State's case. Additionally, it is no matter that much of the evidence required a credibility assessment; credibility determinations are properly left to the jury. The test for harmless error asks whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Harris*, 2008 WI 15, ¶ 43, 307 Wis. 2d 555, 745 N.W.2d 397 (citations omitted). Considering the trial court's effort to limit any unfair prejudice as a result of the flight evidence, we determine that the admission of the flight evidence and the giving of the flight instruction had limited effect on Quiroz's trial when it is evaluated in the context of the rest of the evidence of Quiroz's guilt. *See, e.g., id.*, ¶¶ 87–90. That noted, we emphasize that though touched upon in order to provide a complete discussion, the harmless error analysis is not required because the trial court did not err in admitting the flight evidence and in giving the flight instruction.

*By the Court.*—Judgment affirmed.

■■■■■■

the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial." WIS. STAT. § 805.18(2).