COURT OF APPEALS
DECISION
DATED AND FILED

January 10, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP1840-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF220

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

TED LOPEZ,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Dunn County: ROD W. SMELTZER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Following a jury trial, Ted Lopez was convicted of sexually assaulting "Daniel,"[1] the son of his former girlfriend, when Daniel was between six and seven years old.  On appeal, Lopez contends that the circuit court erred by: (1) allowing a social worker to testify as an expert witness on topics beyond her field of expertise; (2) allowing the State to play recordings of two interviews with Daniel and an interview with another child, Carter, even though both of those witnesses also testified at trial; (3) allowing one of Lopez's former girlfriends, Elena, to testify regarding threats that Lopez made against her after he was charged in this case and fled to Minnesota; and (4) allowing the State's other-acts evidence to "overwhelm its proof of the charged crimes."  We reject each of these arguments and affirm Lopez's judgment of conviction.

## BACKGROUND

¶2      In June 2016, thirteen-year-old Daniel told a social worker that Lopez had sexually assaulted him at least twenty times when Daniel was between six and seven years old.  Based on Daniel's allegations, the State charged Lopez with a single count of repeated sexual assault of the same child.  The State ultimately filed five more charges against Lopez based on additional allegations involving Daniel:  causing mental harm to a child; first-degree sexual assault of a child (sexual intercourse with a person under age twelve); exposing a child to harmful material; and two counts of child enticement.  The State also filed multiple felony charges against Lopez in two other cases, based on allegations that

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim in this case.  We also use pseudonyms when referring to the victim in another criminal case filed against Lopez ("Carter") and one of Lopez's former girlfriends ("Elena").  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

Lopez had sexually assaulted Carter and another child and had possessed child pornography.

¶3 In January 2017, Lopez's father posted a cash bond to secure Lopez's release from custody. Six months later, Lopez failed to appear at a hearing on his three pending cases, and a bench warrant was issued for his arrest. Approximately eight months later, Lopez was apprehended in Minnesota, where he had been residing under an alias.

¶4 The instant case proceeded to a jury trial in December 2018. Prior to trial, the State filed notices of its intent to introduce: (1) recordings of two interviews with Daniel; (2) expert testimony from social worker Michelle Harris regarding the reasons for delayed reporting in child sexual assault cases, "the interplay of a child's developmental level and … disclosure in a forensic interview," and "what the medical evaluation of a sexual abuse victim can show and what it cannot show and why or why not a medical evaluation of a young child may be appropriate depending on the type of disclosure made and the amount of time that has [e]lapsed"; (3) evidence regarding Lopez's flight to Minnesota, including threats that Lopez made to his then-girlfriend, Elena, after she provided law enforcement with information concerning his whereabouts; and (4) other-acts evidence regarding the conduct charged in Lopez's other two pending criminal cases.

¶5 Following a *Daubert*[2] hearing, the circuit court ruled that Harris's expert testimony on the topics proposed by the State would be admissible at trial.

---

[2] *See **Daubert v. Merrell Dow Pharms., Inc.**, 509 U.S. 579 (1993).

As to the State's motion to introduce other-acts evidence, the court ruled that the State could introduce evidence regarding Lopez's sexual assaults of Carter and evidence regarding the child pornography found on Lopez's computer, but the State could not introduce evidence regarding Lopez's conduct with a third child. The court also ruled that the State could introduce the recordings of Daniel's and Carter's interviews, as long as both boys were made available for cross-examination. The court further ruled that the State could introduce evidence regarding Lopez's flight to Minnesota, including evidence of his threats to Elena, but it could not introduce evidence regarding Lopez's threats to law enforcement.

¶6      At trial, Daniel's school counselor testified that Daniel told her he had been sexually assaulted by Lopez, and she reported that information to county authorities. Heather Russo, the child protection social worker who followed up on the school counselor's report, then testified about a forensic interview that she conducted with Daniel at the police department. A recording of that interview was played for the jury. During the interview, Daniel stated that Lopez had sexually assaulted him at least twenty times when Daniel was between six and seven years old. Daniel reported that he and his mother lived in a trailer with Lopez, and when Daniel's mother was not home, Lopez would come into Daniel's room, tell Daniel to pull down his pants, and touch Daniel's penis with his hands and mouth. At times, Lopez would also make Daniel touch Lopez's penis with his hands.

¶7      After the recording of Daniel's first forensic interview was played for the jury, Harris testified about—among other things—the process of conducting a forensic interview of a child, the signs and symptoms of sexual assault in children, the circumstances under which children should and should not receive a sexual assault examination, reasons why children may delay disclosing sexual abuse, and how common it is for a physical examination of a child victim to

4

yield physical evidence of a sexual assault. Harris then discussed a second forensic interview that she had conducted with Daniel at the child advocacy center. A recording of that interview was played for the jury.

¶8     During the second forensic interview, Daniel discussed two specific incidents that he had not disclosed in his prior interview with Russo. In the first incident, Lopez drove Daniel to a hotel, stopping at a sex shop along the way where Lopez purchased a tan sex toy. At the hotel, Daniel wanted to go swimming in the hotel pool, but Lopez took out the sex toy and told Daniel to "use it on [Lopez's] rear" or Daniel would not be allowed to swim. Daniel refused and went swimming. Afterward, Lopez again asked Daniel to use the sex toy on him, and Daniel again refused.

¶9     The second incident occurred at Lopez's house when Daniel went there to visit his sister, after he was no longer living with Lopez. Lopez made Daniel smoke marijuana and also showed Daniel pornography. Lopez tried to put his mouth on Daniel's penis, but Daniel pushed him away and stated he "didn't want to do it." Lopez then forced Daniel to put his penis into Lopez's anus.

¶10     The State subsequently called Daniel to testify at trial. Daniel testified that while he was living with his mother and Lopez, Lopez would come into Daniel's room and touch Daniel's penis with Lopez's hands and mouth. Daniel also testified regarding the incident in which Lopez gave him marijuana, showed him pornography, and forced him to put his penis into Lopez's anus.

¶11     Carter's forensic interview was also played for the jury at trial. During the interview, Carter—who was then ten years old—stated that Lopez began sexually assaulting him when he was five. Lopez would show Carter pornography, including child pornography, and "rape" Carter. Carter elaborated

5

that he and Lopez would touch each other's penises with their mouths, and Carter would also touch Lopez's penis with his hands. Carter also stated that Lopez made Carter put his penis into Lopez's anus on multiple occasions. Lopez tried to put his penis into Carter's anus, but it did not fit. Carter also reported that on one occasion, Lopez had his adult girlfriend over, and the three of them had sexual intercourse together.

¶12 Consistent with his forensic interview, Carter testified at trial that Lopez began sexually assaulting him when he was five years old and stopped when he was eight or nine. Carter testified that Lopez used his mouth to touch Carter's penis, and Carter did the same to Lopez. Carter also testified that he engaged in sexual acts with Lopez and Lopez's girlfriend. He further confirmed that Lopez had shown him pornography.

¶13 A law enforcement officer testified at trial regarding her forensic analysis of a computer seized from Lopez's home that contained documents associated with Lopez, including his résumé. The officer also testified that she found approximately 3,000 images of child pornography on that computer.

¶14 The State additionally introduced evidence at trial regarding Lopez's flight to Minnesota after the charges against him were filed. As relevant to this appeal, Elena testified that during the summer of 2017, Lopez provided her with a "back-up phone" that she could use to stay in contact with him after he fled to Minnesota. Elena testified that she remained in contact with Lopez while he was in Minnesota, but she was afraid to visit him. Lopez became angry that Elena would not visit him, and she therefore tried to end their relationship. Elena subsequently contacted the police and reported that Lopez was harassing her. Elena testified that Lopez then left her a threatening voice message and sent her a

picture of guns, along with a text message stating that he would "bring his gang along to come to [her] work … to come after [her] and then he'll come after the cops."

¶15    The circuit court provided a cautionary jury instruction regarding the other-acts evidence introduced at Lopez's trial.  The jury ultimately found Lopez guilty of all six offenses charged in this case.  Lopez now appeals.

## DISCUSSION

¶16    On appeal, Lopez challenges several of the circuit court's evidentiary rulings.  The admission of evidence is subject to the circuit court's discretion, and we will not disturb the court's decision to admit evidence unless the court erroneously exercised its discretion.  *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448.  A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a demonstrated rational process to reach a reasonable conclusion.  *Magyar v. Wisconsin Health Care Liab. Ins. Plan*, 211 Wis. 2d 296, 302, 564 N.W.2d 766 (1997).

### I.  Harris's expert testimony

¶17    Circuit courts have "'considerable leeway' in determining the admissibility of expert testimony."  *State v. Smith*, 2016 WI App 8, ¶7, 366 Wis. 2d 613, 874 N.W.2d 610 (2015) (citation omitted).  A court's decision to admit or exclude expert testimony is governed by WIS. STAT. § 907.02(1), which "adopts the federal 'reliability' standard developed in *Daubert* and its progeny."  *State v. Hogan*, 2021 WI App 24, ¶18, 397 Wis. 2d 171, 959 N.W.2d 658, *review*

*denied*, 2022 WI 90.  Under § 907.02(1), there are three "threshold requirements" for the admission of expert testimony:

> the witness must be *qualified* ("a witness qualified as an expert by knowledge, skill, experience, training, or education"); the witness's testimony must be *relevant* ("[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); and … the witness's testimony must be *reliable* ("if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case").

*Hogan*, 397 Wis. 2d 171, ¶19 (quoting § 907.02(1)).

¶18    Lopez concedes that "[m]uch of the expert testimony Harris offered was indisputably proper under *Daubert*."  He argues, however, that the circuit court erred by permitting Harris to testify regarding "matters she was not qualified to address"—namely, "what the medical evaluation of a sexual abuse child victim can show and what it cannot show" and "why … a medical evaluation of a young child may be appropriate depending on the type of disclosure made and the amount of time that has [e]lapsed."  Lopez contends that Harris, a social worker, was not qualified to provide expert *medical* testimony regarding those topics.

¶19    In particular, Lopez challenges Harris's trial testimony that research shows that "between 70 and 90 percent of children that made a disclosure of sexual assault, [where] that disclosure was corroborated by other evidence[,] do not have physical findings even if there was a penetration by force."  We agree with the State that Harris was qualified to provide this testimony.  No medical knowledge was required for Harris to tell the jury what percentage of medical examinations yield physical findings in child sexual assault cases.  Harris was not providing a medical or scientific opinion on that topic.  Instead, she was simply

relaying a statistic that she knew by virtue of her experience as a social worker dealing with cases involving child sexual assault. At the *Daubert* hearing, Harris explained that her testimony regarding the incidence of physical findings in child sexual assault cases was based on "a lot of research studies" that she had reviewed. We agree with the State that the mere incidence of physical findings in such cases "has nothing to do with advanced medical knowledge and is squarely within Harris's field as a child protective services social worker."

¶20    Lopez also challenges Harris's testimony that she would not expect a physical examination conducted five years after a sexual assault to yield "findings of sexual abuse" because

> the genital area of a body … has cells that are similar to the inside of your mouth. So when you bite your cheek, that heals really quickly and it's the same for the genital area. It heals so quickly. That's why I would not expect physical findings after delayed disclosure.

Again, we agree with the State that Harris was qualified to provide this testimony.

¶21    WISCONSIN STAT. § 907.02(1) expressly states that experience or training can be sufficient to qualify a witness as an expert. Here, although Harris did not have a medical degree, her testimony at the *Daubert* hearing showed that she was qualified, based on her training and experience, to provide a brief statement as to why physical findings would not be expected in a case where a sexual assault was not disclosed for several years. Specifically, Harris explained at the *Daubert* hearing that she had participated in and had assisted doctors with medical examinations of children in cases involving child neglect, sexual abuse, and physical abuse. Harris also testified that she had attended "multiple different trainings related to the medical concepts of child abuse and neglect." Given this training and experience, the circuit court did not erroneously exercise its discretion

9

by allowing Harris to testify as to the physiological reasons that injuries would not be expected in a case where a sexual assault was not disclosed for a period of several years.

¶22     In addition to attacking Harris's qualifications to provide the testimony discussed above, Lopez also asserts that the circuit court failed to address whether Harris's principles and methods were reliable and whether she reliably applied those principles and methods to the facts of this case. *See* WIS. STAT. § 907.02(1).  Where a circuit court fails to explain its reasoning, however, we may "search the record to determine if it supports the court's discretionary decision." *Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737.

¶23     As discussed above, during the ***Daubert*** hearing, Harris testified regarding her training and experience, which included experience assisting in medical examinations of child victims and attending training regarding medical concepts related to child abuse and neglect.  Harris also clarified that she had reviewed research studies showing that physical findings are not present in seventy to ninety percent of child sexual assault cases.  Based on this testimony, the circuit court could reasonably conclude that Harris's methods—i.e., the review of research studies and reliance on her experience—and the resulting principles that she derived from those methods regarding child sexual assault were reliable. The court could further determine that Harris had reliably applied those principles and methods to the facts of this case, which involved a multiple-year delay between the sexual assaults and Daniel's disclosure of the assaults.  Under these circumstances, the court did not erroneously exercise its discretion by admitting Harris's testimony.

## II. Recorded interviews of Daniel and Carter

¶24 Lopez next argues that the circuit court erred by admitting Daniel's and Carter's recorded interviews *in addition to* their live testimony. Lopez concedes that the recordings of the interviews were admissible under WIS. STAT. § 908.08. He further concedes that the court did not erroneously exercise its discretion by admitting the recordings under that statute. Instead, Lopez argues that it was plain error for the court to admit *both* the recordings *and* Daniel's and Carter's live testimony regarding the assaults because the recordings and testimony were duplicative of one another. Lopez therefore contends that the court should have sua sponte excluded either the recordings or Daniel's and Carter's live testimony under WIS. STAT. § 904.03.

¶25 "The plain error doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object." *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77; *see also* WIS. STAT. § 901.03(4). However, the error must be "obvious and substantial," and "[c]ourts should use the plain error doctrine sparingly." *Jorgensen*, 310 Wis. 2d 138, ¶21 (citation omitted). For example, the plain error doctrine should be utilized "where a basic constitutional right has not been extended to the accused." *Id.* (citation omitted).

¶26 Here, we conclude the circuit court did not commit *any* error, let alone plain error, by admitting Daniel's and Carter's recorded interviews in addition to their live testimony. As Lopez concedes, the recorded interviews were admissible under WIS. STAT. § 908.08. That statute expressly provides that "[i]f the court or hearing examiner admits a recorded statement under this section, the party who has offered the statement into evidence may nonetheless call the child

11

to testify immediately after the statement is shown to the trier of fact." Sec. 908.08(5)(a). Thus, binding statutory authority permitted the State to introduce both the recorded interviews and Daniel's and Carter's live testimony.

¶27 Lopez argues that the circuit court should have nevertheless excluded either the recorded interviews or Daniel's and Carter's testimony under WIS. STAT. § 904.03, because the interviews and testimony were duplicative of one another. This argument is premised on a single social science journal article, which Lopez cites for the proposition that "repeated statements are believed more than new ones." Lopez contends that because the court allowed the jury to hear Daniel's and Carter's allegations more than once, the jury likely became more inclined to believe those allegations each time it heard them.[3] According to Lopez, "[b]y letting the State present cumulative recordings with such intensely inflammatory content, the circuit court let the State erode the jury's capacity to reasonably evaluate [Daniel's] word [as to whether the assaults occurred]."

¶28 As the State points out, our supreme court has cautioned against courts relying on social science research because "the judiciary is not in a good position to judge social values or social science." *See State v. Roberson*, 2019 WI 102, ¶38, 389 Wis. 2d 190, 935 N.W.2d 813. "When social science is disputed, the institutional parameters of the judiciary are amplified. It is the legislature that is structured to assess the merits of competing policies and ever-changing social

---

[3] Lopez asserts that because the jury heard two recorded interviews of Daniel as well as Daniel's trial testimony, the jury heard Daniel "recount his story of abuse three time[s]." As the State correctly notes, however, Daniel's first recorded interview was limited to the sexual assaults that occurred in his home, while the second recorded interview focused on two other incidents. We therefore agree with the State that the jury heard Daniel's "story" at most twice, rather than three times.

science assertions." *Id.* These concerns are particularly relevant in this case, where Lopez has cited a single journal article that is over ten years old. It is for the legislature, not this court, to assess the relevant research and determine whether that research justifies restricting a party's ability to present both a child witness's recorded interview and that witness's live testimony during the same trial.

¶29 In WIS. STAT. § 908.08(5)(a), the legislature has expressly stated that both a child's recorded interview and the child's live testimony may be introduced. Thus, while Lopez argues that the circuit court should have excluded the boys' testimony under WIS. STAT. § 904.03 on the grounds that it was duplicative, § 908.08(5)(a) specifically contemplates that a jury will hear both a child witness's recorded interview and the same child's live testimony. In other words, the legislature has expressly approved the introduction of duplicative evidence in this specific instance. Neither this court nor the circuit court may second-guess that legislative decision.

¶30 To the extent Lopez intends to argue that the admission of the recorded interviews *and* the boys' live testimony was unfairly prejudicial under WIS. STAT. § 904.03, we disagree. The fact that Daniel's interviews and trial testimony were so consistent, despite occurring over two years apart, lent significant credibility to Daniel's testimony regarding the assaults. Thus, the probative value of this evidence was significant. On the other side of the balance, we agree with the State that "the only potential prejudice is that the jury may have heard Daniel say some things more than once—a scenario that WIS. STAT. § 908.08 explicitly permits."

13

¶31    With respect to Carter's interview and testimony, the probative value of that evidence was high, as the assaults alleged by both boys were similar, such that Carter's evidence tended to establish Lopez's motive, intent, and plan to sexually assault Daniel.[4]  Furthermore, the probative value of Carter's evidence was not substantially outweighed by the danger of unfair prejudice.  Again, WIS. STAT. § 908.08 expressly permits a jury to hear both a child witness's recorded interview and the same witness's live testimony, which suggests that the legislature does not view that scenario as being unfairly prejudicial.  While Lopez characterizes Carter's testimony as being "highly inflammatory," we do not view Carter's evidence as being significantly more inflammatory than Daniel's allegations against Lopez, which the jury had already heard.  Although Carter's recorded interview and testimony were clearly prejudicial to Lopez, Lopez has not shown that this evidence was *unfairly* prejudicial.  *See **State v. Alexander***, 214 Wis. 2d 628, 642, 571 N.W.2d 662 (1997) ("Nearly all of the State's evidence is prejudicial to the defendant in some way.  To be excludable, the evidence must be unfairly prejudicial." (citation omitted)).

¶32    Finally, Lopez appears to suggest that the circuit court, in its pretrial ruling allowing the State to introduce the recorded interviews, implicitly prohibited the State from calling Daniel and Carter to testify at trial.  We find no support for that proposition in the court's pretrial ruling.  Instead, the court merely ruled that the State would be allowed to introduce the recorded interviews at trial and that Daniel and Carter would "be required to be made available for

---

[4] On appeal, Lopez does not argue that the circuit court erred by permitting the State to introduce other-acts evidence regarding the sexual assaults alleged by Carter.  Lopez argues only that the court should not have allowed the State to introduce *both* Carter's recorded interview *and* his live testimony regarding those assaults.

cross[-]examination." The court's statement to that effect was consistent with WIS. STAT. § 908.08(5)(a), which provides that if a child whose recorded interview is played at trial does not testify on direct examination, the court shall, upon a party's request, "order that the child be produced immediately following the showing of the statement to the trier of fact for cross-examination." The court's recognition of the statutory requirement that Daniel and Carter be made available for cross-examination cannot be construed as an order prohibiting the State from calling Daniel and Carter to testify.

### III. Elena's testimony regarding Lopez's threats

¶33 Lopez next argues that the circuit court erroneously exercised its discretion by allowing Elena to testify regarding the threats that Lopez made to her after he fled to Minnesota. The court determined that Elena's testimony regarding the threats was admissible as evidence of flight. "[F]light is an admission by conduct," and "[t]he fact of an accused's flight is generally admissible against the accused as circumstantial evidence of consciousness of guilt and thus of guilt itself." *State v. Quiroz*, 2009 WI App 120, ¶18, 320 Wis. 2d 706, 772 N.W.2d 710. Lopez contends, however, that Elena's testimony regarding the threats was not related to Lopez's flight and was instead "highly prejudicial other-acts evidence" that was elicited to "portray[] Lopez as dangerous and violent."

¶34 In response, the State asserts the circuit court correctly concluded that Elena's testimony regarding the threats was admissible as flight evidence. In the alternative, the State argues that even if Elena's testimony constituted other-acts evidence, it was properly admitted as such. We assume, without deciding, that Elena's testimony regarding the threats was properly classified as other-acts evidence, rather than evidence of flight. Nevertheless, we agree with

15

the State that the court did not erroneously exercise its discretion by admitting that evidence. *See* ***State v. Smiter***, 2011 WI App 15, ¶9, 331 Wis. 2d 431, 793 N.W.2d 920 (2010) (court of appeals may affirm a circuit court's decision on different grounds).

¶35 "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith," but such evidence may be admissible "when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." WIS. STAT. § 904.04(2)(a). We apply a three-prong test when assessing the admissibility of other-acts evidence. *See* ***State v. Sullivan***, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998). First, the evidence must be offered for a permissible purpose under § 904.04(2)(a). *Sullivan*, 216 Wis. 2d at 772. Second, the evidence must be relevant under WIS. STAT. § 904.01. *Sullivan*, 216 Wis. 2d at 772. Third, the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice under WIS. STAT. § 904.03. *Sullivan*, 216 Wis. 2d at 772-73.

¶36 We agree with the State that Elena's testimony regarding the threats satisfied all three prongs of the *Sullivan* test. First, the evidence was offered for a permissible purpose because it provided context for Lopez's flight and explained Elena's hesitance to turn Lopez in. Absent Elena's testimony about the threats, the jury would have been left wondering why Elena did not turn Lopez in to law enforcement sooner and may have doubted her credibility for that reason. "[C]ontext, credibility, and providing a more complete background are permissible purposes under WIS. STAT. § 904.04(2)(a)." ***State v. Marinez***, 2011 WI 12, ¶26, 331 Wis. 2d 568, 797 N.W.2d 399.

¶37    Second, Elena's testimony regarding the threats was relevant because it helped to explain Lopez's flight and his efforts to evade capture. As noted above, evidence of flight is "circumstantial evidence of consciousness of guilt and thus of guilt itself." *Quiroz*, 320 Wis. 2d 706, ¶18. By providing context for Lopez's flight, Elena's testimony regarding the threats was relevant to show Lopez's consciousness of guilt. Her testimony therefore "ma[d]e the existence of [a] fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* WIS. STAT. § 904.01.

¶38    Third, the probative value of Elena's testimony was not substantially outweighed by the danger of unfair prejudice. Evidence of Lopez's threats to Elena was highly probative because it helped to explain and provide context for Lopez's flight, which in turn was relevant to show Lopez's consciousness of guilt. Conversely, the risk of unfair prejudice from Elena's testimony was minimal. Evidence is unfairly prejudicial if it has a tendency to influence the outcome by improper means or if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise causes a jury to base its decision on something other than the established propositions in the case." *State v. Muckerheide*, 2007 WI 5, ¶33, 298 Wis. 2d 553, 725 N.W.2d 930. Other-acts evidence involving conduct that is less serious than the charged conduct is unlikely to appeal to the jury's sympathies or arouse its sense of horror. *See State v. Normington*, 2008 WI App 8, ¶35, 306 Wis. 2d 727, 744 N.W.2d 867 (2007); *State v. Volk*, 2002 WI App 274, ¶24, 258 Wis. 2d 584, 654 N.W.2d 24.

¶39    In this case, Lopez was charged with repeatedly sexually assaulting a young child. Compared to Daniel's allegations of sexual assault, evidence that Lopez had threatened his girlfriend would not have been particularly likely to appeal to the jury's sympathies or arouse its sense of horror. *See Volk*, 258

17

Wis. 2d 584, ¶24 (reasoning that none of the incidents described by an other-acts witness were worse than the crime for which the defendant was being tried, and "[a]ny sense of sympathy or horror held by the jury would likely be most attributable to [the victim's] testimony," not that of the other-acts witness). In addition, we observe that the circuit court provided a cautionary jury instruction regarding the proper use of the other-acts evidence admitted at Lopez's trial. We presume that jurors follow the court's instructions. *See State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

¶40 In summary, we conclude that Elena's purported other-acts testimony regarding Lopez's threats was offered for a permissible purpose, was relevant under WIS. STAT. § 904.01, and the evidence's probative value was not substantially outweighed by the danger of unfair prejudice under WIS. STAT. § 904.03. Accordingly, the circuit court did not erroneously exercise its discretion by admitting Elena's testimony.[5]

---

[5] The circuit court ruled that Elena could testify regarding threats that Lopez made toward her, but she could not testify regarding threats that he made toward law enforcement. Despite that ruling, Elena testified that Lopez sent her a text message stating that he would "bring his gang along to come to [her] work … to come after [her] and then he'll come after the cops." Lopez's trial attorney immediately objected, and the court held a sidebar. Lopez's attorney subsequently requested a mistrial, based in part on Elena's testimony regarding Lopez's threat toward law enforcement. The court denied Lopez's request for a mistrial but offered to provide a curative instruction regarding Elena's testimony. Lopez chose not to have the court provide a curative instruction because he was concerned that such an instruction would merely highlight the objectionable testimony.

Lopez does not develop any argument on appeal that the circuit court erred by denying his request for a mistrial. Lopez also does not argue that his trial attorney was ineffective by failing to request a curative instruction. We will not abandon our neutrality to develop these arguments on Lopez's behalf. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

## IV. Cumulative effect of the State's other-acts evidence

¶41     Finally, Lopez argues that the circuit court erred by "letting the State's other-acts evidence overwhelm its proof of the charged crimes." He notes that the court allowed the State to introduce: (1) evidence regarding Carter's allegations against Lopez; (2) evidence regarding Lopez's possession of child pornography; and (3) evidence regarding the threats that Lopez made to Elena after he fled Wisconsin.

¶42     Lopez asserts that there are "two sets of questions about the circuit court's admission of all this other-acts evidence": "First, was each individual piece of evidence properly admitted?  And second, even if each piece of evidence was admissible on its own, was the overall effect of the other-acts evidence unfairly prejudicial or otherwise impermissible?"  Lopez emphasizes that "almost twice as many witnesses testified to Lopez's other acts as to the crimes he was on trial for."  He asserts that "[w]hatever probative value the State's copious other-acts evidence may have had, the risks of letting it all in were simply too high."  Stated differently, Lopez contends that even if each piece of other-acts evidence was individually admissible, "the full scope of other-acts evidence introduced at [his] trial raised an impermissible risk of unfair prejudice and confusion of the issues" under WIS. STAT. § 904.03.

¶43     As an initial matter, we agree with the State that there are not "two sets of questions" regarding the other-acts evidence in this case.  Instead, when considering whether other-acts evidence is admissible under the third step of the *Sullivan* analysis, a court must "consider the proponent's need to present this evidence *given the context of the entire trial*."  *State v. Hurley*, 2015 WI 35, ¶87, 361 Wis. 2d 529, 861 N.W.2d 174 (emphasis added).  Thus, we agree with the

State that "[a] section 904.03 analysis for each piece of evidence—which is the third step of the *Sullivan* test—includes a consideration of the totality of the evidence already admitted and sought to be admitted in the case."

¶44     Ultimately, Lopez has not shown that any of the other-acts evidence in this case was unfairly prejudicial under WIS. STAT. § 904.03.  *See Hurley*, 361 Wis. 2d 529, ¶58 (stating that the party opposing the admission of other-acts evidence has the burden to prove that the evidence's probative value is substantially outweighed by the danger of unfair prejudice).  Each category of other-acts evidence was highly probative of Lopez's guilt.   The other-acts evidence involving Carter was relevant to demonstrate Lopez's motive, intent, and plan to sexually assault Daniel.   Similarly, evidence regarding the child pornography helped to show that Lopez had the motive and intent to seek sexual gratification from engaging in sexual activities with prepubescent children.  Elena's testimony regarding Lopez's threats, in turn, provided context for other evidence regarding Lopez's flight and arrest, which helped to establish Lopez's consciousness of guilt.

¶45     These categories of other-acts evidence were not cumulative of one another.  The only similarity between the three categories was that each related to different bad acts that Lopez allegedly committed.  The different categories of evidence served different purposes, and each category was probative as to an important issue at Lopez's trial.

¶46     Moreover, as already noted, the circuit court provided a cautionary jury instruction regarding the other-acts evidence, which specified the purposes for which the jury could consider that evidence and admonished the jurors that the evidence could not be used "to conclude the defendant is a bad person, and for that

reason, is guilty of the offense charged." Our supreme court has recognized that such cautionary instructions are "an effective means to reduce the risk of unfair prejudice to the party opposing admission of other[-]acts evidence." *Marinez*, 331 Wis. 2d 568, ¶41. Again, we presume that jurors follow the court's instructions. *See Truax*, 151 Wis. 2d at 362.

¶47 For all of these reasons, we reject Lopez's argument that the circuit court erred by permitting the State to introduce too much other-acts evidence at his trial. The probative value of the other-acts evidence was not substantially outweighed by the danger of unfair prejudice.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.